NOT DESIGNATED FOR PUBLICATION

No. 128,843

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of D.G. and N.G., Minor Children.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; JANE A. WILSON, judge. Submitted without oral argument. Opinion filed November 21, 2025. Affirmed.

*Jeffrey Leiker*, of Leiker Law Office, P.A., of Overland Park, for appellant natural mother.

*David M. Grace*, assistant district attorney, and *Mark A. Dupree Sr.*, district attorney, for appellee.

Before HURST, P.J., GARDNER and BOLTON FLEMING, JJ.

PER CURIAM: The district court terminated Mother's parental rights, finding that she was unfit and that the condition or conduct rendering her unfit was unlikely to change in the foreseeable future, pursuant to K.S.A. 38-2269(a). The district court also found termination to be in the best interests of the children under K.S.A. 38-2269(g)(1).

On appeal, Mother argues that insufficient evidence supports the district court's decision to terminate her parental rights. Mother also asserts that the district court abused its discretion by allowing expert witnesses to testify without complying with the expert witness requirements in K.S.A. 2024 Supp. 60-226(b)(6).

After a thorough review of the record, we find that clear and convincing evidence supports the district court's decision under K.S.A. 38-2269(a) that Mother was unfit by

1

reason of conduct or condition that rendered her unable to properly care for her children, and that conduct or condition is unlikely to change in the foreseeable future. The district court properly applied a presumption of unfitness as well as four statutory factors that supported its finding of unfitness. The district court also did not abuse its discretion in making the requisite finding that the termination was in the best interests of the children. The children had been in foster care for over six years, and despite Mother's efforts, reintegration was no longer viable. Considering the physical, mental, and emotional needs of the children, termination of Mother's parental rights was in their best interests.

Additionally, the district court did not abuse its discretion in allowing testimony from a psychologist and case manager at the termination hearing because the requirements for expert witnesses under K.S.A. 2024 Supp. 60-226(b)(6) do not automatically apply to cases filed under the Revised Kansas Code for Care of Children. Instead, if the district court holds a hearing and finds that under K.S.A. 38-2245(a), "discovery procedures, as described in K.S.A. 60-226 through 60-237, and amendments thereto, will expedite the proceedings, the judge may allow discovery subject to limitations." Finding no error, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On March 7, 2018, N.G. was brought to Children's Mercy Hospital with significant bruising on her buttocks. On March 13, 2018, both N.G. and her sibling D.G. were taken into custody by the Department for Children and Families (DCF) and a Child in Need of Care (CINC) case was filed by the State. In addition to describing N.G.'s injuries, the petition noted a significant family history with DCF as well as the fact Mother's parental rights to another child had been terminated, and that child was adopted. On April 10, 2018, both parents entered no contest statements, and the children were adjudicated Children in Need of Care.

2

*Case Plan Tasks*

A case plan was developed for both parents that included obtaining stable employment, appropriate housing, a parent assessment, a psychological evaluation, education to manage N.G.'s diabetes, a domestic violence assessment, and counseling. The parents were to follow the recommendation of any assessment. Additionally, the parents were ordered to undergo random urinalysis testing, and Mother was to participate in individual therapy to address anger management.

*First Termination Hearing and Resumed Reintegration Efforts*

After the case had been pending for some time, the State filed a Motion to Terminate Parental Rights, and on June 15, 2021, the district court terminated the parental rights of Mother, the Father participating in the case, and an additional putative father. The parents appealed, and all parties agreed that insufficient evidence supported the termination. On January 18, 2023, our court reversed the termination decision and remanded the case to the district court for further proceedings and a resumption of efforts to reintegrate the children. Soon after, the participating Father decided his health issues would not allow him to participate in a case plan, and that instead he would let Mother work towards reintegration. The other putative father never participated in the cases.

*Second Termination Hearing*

After Mother had worked on the case plan again for some time, the State filed a second motion to terminate parental rights. Bifurcated evidentiary hearings were conducted on October 17, 2024, and November 4, 2024. At the time of the termination hearing, the children were 11 and 10 years old and their cases had been pending since March 2018. The children had been in foster care for over six years.

*Visitations Between Mother and Children*

Cornerstones of Care (Cornerstones) Case Manager Jorie Simon testified at the termination hearing. Simon began as the family's case manager in April 2021. Simon worked closely with Mother towards the case plan goal of reintegration.

Simon testified that one component of the case plan was for Mother to have visits with the children. Simon testified that she observed visits between Mother and the children for over three years, and the visits had shown minimal success. Early in the case, the visits were conducted in Mother's home with the children. Simon testified that Mother's behavior during visits with the children was dysregulated and out of control to the point the social workers did not feel safe being in Mother's home. One example of this behavior occurred on November 6, 2023, when Simon testified that a visit between Mother and the children became "hostile" due to Mother not being familiar with the method required to administer insulin to N.G. During this visit, Mother screamed at Simon and a nurse case manager that was present. As a result of Mother's behavior, a safety plan was created to address any future aggression by Mother. Simon testified that safety plans are provided in such situations to ensure visits are both emotionally and physically safe for the children. Two different safety plans were eventually put in place due to safety concerns raised by the social workers supervising visits in Mother's home.

Eventually, visits between Mother and the children were moved back to the Cornerstones office, due to safety concerns. At the time of the termination hearing, Mother was only having supervised visits once every two weeks due to her inappropriate behavior. Kristen Carlson, a nurse case manager providing support to Mother, stated that visits with Mother had become emotionally distressful and harmful for the children.

*Housing*

At the time these cases originated in 2018, Mother and Father were renting a home. For some time, the parental home was appropriate, but on July 31, 2023, Simon visited the home and observed insects inside, fleas on the family dog, and issues with cleanliness in the kitchen. Later, Mother would be evicted from this home and move to a hotel.

Court Service Officer Ramona MacDougall was also assigned to help manage the children's cases. She started working with the family in March 2018. She testified that Mother did have stable housing for a significant period of time, but that was no longer true. At the time of the termination hearing in 2024, Mother resided in a one-bedroom hotel room with her husband and a dog. McDougall also testified that Mother was facing a possible eviction from the hotel. There was no evidence at the hearing that Mother was able to provide appropriate housing for the children as of the time of the termination hearing.

*Mother's Mental Health and Family Therapy Efforts*

Another case plan task was for Mother to take steps to address her mental health and participate in family therapy.

Dr. Stephen Hazel testified at the termination hearing. Dr. Hazel conducted a psychological evaluation and a parenting assessment for Mother. He testified that although Mother had a genuine interest in being involved in the children's lives, Mother had a pattern of aggressive and angry behavior. Dr. Hazel testified that Mother was for the most part noncompliant during the evaluation process and refused to complete the intellectual assessment. Based on the assessment he was able to complete, Dr. Hazel concluded that Mother suffered from multiple mental health conditions. To address the

issues identified in her psychological evaluation, Dr. Hazel recommended Mother participate in Dialectical Behavioral Therapy (DBT) and Lead Parent Management Training-Oregon (PMTO).

Mother initially refused to participate in DBT due to cost. Eventually, Cornerstones agreed to pay those costs so Mother could complete DBT. Mother then refused to participate in DBT because it required two weekly meetings. Instead, Mother agreed to participate in individual therapy. Simon testified that individual therapy was not helpful to Mother because she often left early or cancelled. Mother was not successful in completing individual therapy.

PMTO provider Kaitlyn McLaughlin also testified at the termination hearing. McLaughlin was assigned to work with Mother and the children at two different times while the cases were pending. McLaughlin worked with the children and Mother as their family therapist to address the needs of the children and improve Mother's parenting skills. McLaughlin testified that many family therapy sessions had been cancelled by Mother or ended early, limiting the amount of progress by Mother and the children.

McLaughlin also testified that Mother subjected the children to emotional abuse. McLaughlin stated that on several occasions Mother responded aggressively to the children, including blaming or shaming them. McLaughlin observed the children "parentifying" Mother in that they often had to parent their mother and try to regulate her. McLaughlin testified that Mother's aggressive behavior towards her had scared her to the point that she was no longer willing to supervise visits in the parental home.

Ultimately, PMTO was unsuccessfully terminated because Mother was not making appropriate progress, and McLaughlin recommended that Mother focus on her own mental health.

*Medical Needs of the Children*

Simon testified that Mother struggled to provide the necessary medical care N.G. needed for her Type 1 diabetes. Simon testified that N.G. required consistent care, and over the six-year life of her case, Mother was unable to adequately provide such care. Mother was provided with nurse case managers to assist her with learning about N.G.'s diabetes but was still unsuccessful. Simon also testified that Mother became angry and difficult when various providers attempted to redirect her on various medical tasks.

Carlson testified that she became involved with the family on January 2, 2024. Carlson's role was to support Mother in providing for the medical needs of her children. Carlson testified that when she provided information to Mother as to the medical care needed for the children, Mother became combative and uncooperative. In addition to being unable to care for N.G.'s diabetes, Carlson testified that Mother was aware of D.G.'s allergies to cats yet adopted one for her home. The cat was later removed because Mother could no longer maintain the cat's medical needs.

Carlson also testified that visits with Mother and the children had become emotionally stressful for the children. This was important because according to Simon, D.G. struggled behaviorally, having been placed in 14 different foster care placements.

*Income*

Both Simon and MacDougall testified that Mother failed to earn or otherwise produce income to support the children. MacDougall started working with Mother in 2018 and testified that the only consistent income Mother had received was Social Security Income (SSI), but that was discontinued once Mother married in 2022. The only other employment Mother had throughout these cases was seasonally working at a haunted house.

*Best Interests*

Multiple witnesses testified that the termination of Mother's parental rights would be in the best interests of the children.

Simon pointed out that the children had been without permanency for a very long time—at the time of the termination hearing, the children had spent over half of their lives in foster care. Simon testified that termination was in the children's best interests. McLaughlin also testified that termination of Mother's parental rights would be in the best interests of the children. MacDougall also supported termination, testifying that if the children were to go home, there would no longer be professionals in the home to assist with the medical and behavioral needs of the children. Finally, Carlson testified she believed termination was in the best interests of the children because of Mother's inability to provide for N.G.'s long-term medical needs and the harm Mother's visits had caused the children. Carlson also noted that Mother's mental health issues impeded her ability to successfully parent.

*Mother's Testimony*

Mother's testimony corroborated most of what the State's witnesses said. Mother testified that she attempted to attend appointments using bus transportation but had some difficulties in attending appointments that were scheduled at a far distance or without her knowledge. Mother also stated that N.G. was not determined to have diabetes until she was placed into foster care. She also testified that she maintains notes, detailed reports, and calendar entries to remain on top of her children's needs.

Mother testified that she did not know a lot about N.G.'s insulin pump and felt she needed additional training. Mother also stated that she felt that the method that was being used to teach her about N.G.'s insulin needs was not appropriate for her as she is more of

a visual learner. She acknowledged an incident where her behavior led to visits in her home ending and being returned to Cornerstones. Mother stated that the incident was a result of her frustration with the nurse case manager failing to show her how to address N.G.'s insulin needs.

Mother testified that she would only need one additional training session to be able to comfortably assist with N.G.'s diabetes. She also testified that much of the reason she failed to complete her case plan tasks stemmed from a change in circumstances after the children's cases were remanded, limited insight into her children's needs while they are not in her care, and a lack of understanding about what is happening behind the scenes.

Mother confirmed she has resided in a one-bedroom hotel apartment with her husband and a dog since April 2024. She has also worked seasonally with Full Moon Productions since 2019, which involves the operation of a haunted house. To provide income for periods outside of her seasonal employment, Mother plans to reapply for SSI and Medicaid.

*District Court Decision*

The district court found by clear and convincing evidence pursuant to K.S.A. 38-2269(a) that Mother was unfit by reason of conduct or condition that rendered her unable to properly care for the children, and that conduct or condition was unlikely to change in the foreseeable future. The court made this finding under four statutory factors:

> "The emotional illness, mental illness, mental deficiency or physical disability of the mother, of such duration or nature as to render the mother unable to care for the ongoing physical, mental and emotions needs of the children pursuant to K.S.A. 38-2269(b)(l). Per the psychological evaluation the mother [h]as several diagnoses related to her mental health and possibly mental deficiency. Those diagnoses have clearly made the

9

mother unable to properly care for her children as evidenced by her inability to address her own mental health with DBT, her outrageous behaviors at visits with her children present and her inability to complete PMTO with her children. The mother is unable and largely unwilling to learn how to manage [N.G.'s] diabetes and then [D.J.] has his own behaviors to manage that the mother cannot address without having her own mental health in a manageable place.

"The mother has demonstrated a lack of effort to adjust her circumstances, conduct or conditions to meet the needs of the children pursuant to K.S.A. 38-2269(b)(8). The mother has failed to have consistent employment, which is court ordered. She has refused to complete court-ordered DBT. The mother failed twice to complete PMTO to satisfy the court order for family therapy. After the second failed attempt, the PMTO therapist notified the court that the mother needed to do DBT before they could attempt PMTO again, however, the mother refused to participate in DBT. The mother failed to comply with safety plans put into place that were designed to make visits more focused and safer for both workers and the children. A second nurse case manager was assigned to [N.G.] so that the mother could learn how to adequately address [N.G.'s] diabetes, however, the mother could not consistently regulate her behavior and outbursts to allow herself to learn and put into practice what was being taught to her. The mother simply refused to appropriately address her mental health issues and, without that, she could never be able to care properly for her children.

"There has been a failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family pursuant to K.S.A. 38-2269(b)(7). The testimony and reports in the case have clearly established the many efforts made to assist the mother with reunification. However, despite those efforts, the mother was unsuccessful.

"The mother has failed to carry out a reasonable plan approved by the court directed toward the reintegration of the children in the parental home pursuant to K.S.A. 38-2269(c)(3)."

Then, the district court found Mother "is an unfit parent by reason of conduct or condition which renders her unable to properly care for her children, and that conduct or

condition is unlikely to change in the foreseeable future." The district court noted Mother's past conduct and the length of the cases in support of its decision.

In addition, the district court applied a presumption of unfitness and found that Mother failed to rebut the presumption:

"The mother is presumed unfit pursuant to K.S.A. 38-2271(a)(6) and 38-227l(a)(1) and in a manner provided by under K.S.A. 60-414(a) in that the children have been in out of home placement for a period of two years or longer, the mother has failed to carry out a reasonable plan, approved by the court, directed toward the reintegration of the children into the parental home and there is a substantial probability that the mother will not carry out the plan in the near future. The mother has had more than ample time to complete the court orders in these cases and she has simply not done so. Looking at past conduct to predict future conduct, the mother will not complete these orders in the near future. In addition, at this hearing, the Court took judicial notice of Wyandotte Case 2011JC251, in which the mother, then [J.M.], was found to be unfit. The mother has failed to rebut either of these presumptions of unfitness."

Finally, as to the best interests of the children, the district court noted the children had a right to permanency within a reasonable time, and that the children had been in foster care for over six years. The district court then terminated Mother's parental rights.

Mother timely appeals.

ANALYSIS

DID THE DISTRICT COURT ERR IN TERMINATING MOTHER'S PARENTAL RIGHTS?

*Standard of Review*

"Termination of parental rights will be upheld on appeal if, after reviewing all the evidence in the light most favorable to the prevailing party, the district judge's fact-

11

findings are deemed highly probable, i.e., supported by clear and convincing evidence. Appellate courts do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. [Citation omitted.]" *In re Adoption of Baby Girl G.*, 311 Kan. 798, 806, 466 P.3d 1207 (2020).

*Discussion*

K.S.A. 38-2269(a) provides the standard district courts must apply in terminating parental rights:

"When the child has been adjudicated to be a child in need of care, the court may terminate parental rights or appoint a permanent custodian when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 38-2269(a).

Additionally, K.S.A. 38-2269(g)(1) requires that the district court must state whether termination of parental rights is in the best interests of the child. Therefore, a district court is required to make three findings in its order terminating parental rights: unfitness, foreseeability, and best interests of the child. K.S.A. 38-2269(a), (g)(1).

In this particular case, a presumption of unfitness is also at issue pursuant to K.S.A. 38-2271(a)(1) (parent has previously been found to be unfit) and K.S.A. 38-227l(a)(6) (child has been in out-of-home placement for cumulative total of one year or longer, parent has failed to complete a reasonable reintegration plan, and substantial probability parent will not carry out plan in near future).

*Applying Statutory Factors*

Mother asserts that there was insufficient evidence to support the district court's finding under K.S.A. 38-2269(a) that she was unfit. In determining unfitness, the district

court may rely on the list of nonexclusive factors in K.S.A. 38-2269(b)-(e). See *In re E.L.*, 61 Kan. App. 2d 311, 323, 502 P.3d 1049 (2021). However, a single factor alone may support a decision to terminate parental rights. K.S.A. 38-2269(f); 61 Kan. App. 2d at 323.

Here, the district found Mother to be unfit based on four statutory factors. Mother does not argue error in applying any specific statutory factor but instead argues that clear and convincing evidence did not support the district court's fact-finding. She offers the following facts in support:

> "The record is replete with evidence of Mother' efforts to comply with court orders and case plan goals. She consistently attended visits, completed numerous court-ordered services over the years, and actively sought to understand and manage her daughter's complex medical needs. She maintained housing for the vast majority of the case and has consistently engaged in seasonal employment, with concrete plans to secure further financial stability. Her engagement in DBT, despite initial financial hurdles that were eventually addressed by the agency, demonstrates a commitment to addressing her mental health."

Mother also argues that the State focused too much on Mother's "perceived failures" and overlooked the "substantial compliance and genuine effort Mother has put forth." Mother also argues that the State failed "to consistently and adequately address Mother's diagnosed learning disabilities and mental health conditions." She claims that the State's failure resulted in "a mismatch between the services offered and her learning needs." Mother argues that the State's failure to consider her needs amounts to a failure to provide reasonable efforts towards rehabilitation.

We consider Mother's arguments within the context of each statutory factor that was considered by the district court.

13

*K.S.A. 38-2269(b)(1)*

A district court may find a parent unfit if there is clear and convincing evidence that the parent suffers from an "[e]motional illness, mental illness, mental deficiency or physical disability of the parent, of such duration or nature as to render the parent unable to care for the ongoing physical, mental and emotional needs of the child." K.S.A. 38-2269(b)(1).

The record indicates that Mother suffers from mental illness. After performing a psychological evaluation, Dr. Hazel diagnosed Mother with several different mental health disorders. Dr. Hazel recommended Mother participate in individual therapy to address her diagnosed issues; however, her case manager testified that Mother often missed individual therapy appointments or left early. Additionally, the evidence at the hearing was that Mother was not cooperative with the mental health professionals that tried to help her and was often combative. While Mother believes that the State failed "to consistently and adequately address Mother's diagnosed learning disabilities and mental health conditions," the evidence was that Mother did not take advantage of the mental health services offered to her, and as a result, she was unable to address her long-term issues of anger, hostility, and blaming behaviors that prevented her from parenting her children. While Mother clearly cares about her children, the evidence at the hearing was that Mother's uncontrolled mental health issues actually harmed her children.

Considering the evidence in the light most favorable to the State, clear and convincing evidence supports the district court's finding that Mother suffers from a mental illness of such duration and nature as to render her unable to care for the ongoing physical, mental, and emotional needs of D.G. and N.G. See K.S.A. 38-2269(b)(1).

14

*K.S.A. 38-2269(b)(7)*

K.S.A 38-2269(b)(7) states that the court shall consider "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family."

Here, Mother argues that the State failed to adequately support her in her rehabilitation efforts. But Mother's argument ignores the large quantity of services she was offered over a six-year time period.

Mother was offered individual therapy but failed to participate. Mother and the children were offered family therapy, but Mother's behavior prevented any progression and ultimately resulted in the service being terminated with the recommendation that Mother focus on her own mental health. A nurse case manager was assigned to Mother to assist her in regulating N.G.'s diabetes, but even after much instruction, Mother was unable to provide for N.G.'s medical needs. Mother was also offered assistance with budgeting and employment services so that she could remain in her home, but Mother again refused to cooperate and this resulted in her being evicted from her home. At the time of the termination hearing, Mother resided in a hotel room and again faced eviction. The State's efforts to support Mother's employment only resulted in seasonal employment. Clear and convincing evidence supports the district court's finding that reasonable efforts by appropriate agencies to rehabilitate the family failed.

*K.S.A. 38-2269(b)(8)*

K.S.A. 38-2269(b)(8) provides that "[i]n making a determination of unfitness the court shall consider. . . [the] lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child." Here, there is clear and convincing evidence that Mother failed to adjust her circumstances to meet the needs of the children.

Mother's lack of progress in adjusting her circumstances to meet the needs of her children is directly related to her mental health. Despite being offered multiple services aimed at improving her mental health, Mother chose to leave appointments early, fail to attend appointments, or fail to cooperate during appointments. Mother's unwillingness to participate in these services is the strongest evidence of her failure to adjust her circumstances to meet the needs of her children.

Additionally, Mother was provided support services for over six years, and yet at the time of termination, visitation between Mother and children had only progressed to supervised visits at the Cornerstones office every two weeks. Progress in visitation was hampered by Mother's inappropriate behavior and outbursts. Mother's behavior was so alarming that two different safety plans were created to keep the children and staff safe during visits. At no point over the six years did visits progress to a point where the children were able to start staying in Mother's home with the hope of reintegration.

Mother also failed to provide suitable housing for the children. While Mother initially lived in a suitable home, a home visit in 2023 revealed the condition of the home had deteriorated. And Mother would later be evicted from that home and move to a one-room hotel where she lived with her husband. At the time of the termination hearing, Mother was again in danger of being evicted. Mother also failed to have consistent employment, which the court had ordered.

Mother argues that she was in substantial compliance with the case plan tasks. In *In re R.S.*, 50 Kan. App. 2d 1105, 1118-19, 336 P.3d 903 (2014), another panel of this court upheld a termination decision where the mother had met some case plan tasks but failed at others. When reviewing the evidence in a light most favorable to the State, the panel concluded that there was clear and convincing evidence that the mother had failed to adjust her circumstances to meet the children's needs. *In re R.S.*, 50 Kan. App. 2d at 1117.

Here, Mother was unwilling or unable to complete all of the requirements for reintegration. While Mother completed her psychological evaluation and parenting assessment, and sporadically participated in other case plan tasks, she failed to complete critical tasks that could have resulted in the children returning home. When viewed in the light most favorable to the State, there was clear and convincing evidence to support the district court's conclusion that Mother was unfit based on K.S.A. 38-2269(b)(8).

*K.S.A. 38-2269(c)(3)*

K.S.A. 38-2269(c)(3) provides that "when a child is not in the physical custody of a parent, the court, shall consider . . . [a parent's] failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home."

Mother argues that the State failed to recognize her mental health limitations and learning disabilities, and therefore the State's plan for reintegration was unreasonable. But Mother's argument is unsupported by the record. Here, there is clear and convincing evidence that multiple agencies attempted to support Mother as she worked on her case plan. And although Mother attended visits, completed some court ordered services, and sought to understand and manage N.G.'s diabetes, she did not complete critical parts of the plan approved by the court directed toward reintegration of the children. See *In re E.L.*, 61 Kan. App. 2d at 328 (parents' attendance at a parenting class and some visits were deemed insufficient given the lack of progress on other critical tasks). At the time of the termination hearing, Mother's mental illness made visits with her children difficult and even harmful. She was unable to provide suitable housing for the family. Family therapy had been terminated due to Mother's behavior, and she had failed to address her own mental health through individual therapy. The district court did not err in finding Mother unfit pursuant to K.S.A. 38-2269(c)(3).

17

*Presumptions of Unfitness*

In addition to direct evidence of Mother's unfitness, the district court found that Mother was presumed to be unfit under several statutory provisions.

*K.S.A. 38-2271(a)(1)*

K.S.A. 38-2271(a)(1) provides:

"(a) It is presumed in the manner provided in K.S.A. 60-414, and amendments thereto, that a parent is unfit by reason of conduct or condition which renders the parent unable to fully care for a child, if the state establishes, by clear and convincing evidence, that:

(1) A parent has previously been found to be an unfit parent in proceedings under K.S.A. 38-2266 et seq., and amendments thereto, or comparable proceedings under the laws of another jurisdiction . . . ." K.S.A. 38-2271(a)(1).

Additionally, K.S.A. 60-414(a) states:

"(a) if the facts from which the presumption is derived have any probative value as evidence of the existence of the presumed fact, the presumption continues to exist and the burden of establishing the nonexistence of the presumed fact is upon the party against whom the presumption operates . . . ." K.S.A. 60-414(a).

Here, Mother does not contest that her rights were previously terminated in Wyandotte County case #11JC251 and that the child has since been adopted. The district court correctly applied the presumption in K.S.A. 38-2271(a)(1) because under K.S.A. 60-414(a), the prior finding of unfitness was probative when considering unfitness in the present case. Therefore, the district court correctly applied the presumption and the burden of proof shifted to Mother to show that she was no longer unfit. Mother does not contest this presumption and does not specifically address this presumption in her brief.

We hold that based upon the discussion of the evidence at the hearing throughout this opinion, Mother failed to successfully rebut the presumption, and the district court correctly found that she was unfit.

*K.S.A. 38-2271(a)(6)*

The district court also found that Mother was presumed to be unfit under K.S.A. 38-2271(a)(6):

> "(a)(6)(A) [T]he child has been in an out-of-home placement, under court order for a cumulative total period of two years or longer; (B) the parent has failed to carry out a reasonable plan, approved by the court, directed toward reintegration of the child into the parental home; and (C) there is a substantial probability that the parent will not carry out such plan in the near future . . . ." K.S.A. 38-2271(a)(6)(A).

Again, Mother does not deny that her children have been in an out-of-home placement, under court order, for over two years. But Mother contends that she substantially complied with the reintegration plan, and there is reason to think she will be successful in completing the plan in the future. Mother's argument ignores the clear and convincing evidence in this case that she was given over six years to complete case plan tasks; yet, at the time of the termination hearing, she lacked appropriate housing, had limited visits with the children due to her behavior, was unable to meet the medical needs of the children, and had failed to complete individual and family therapy. Mother did not offer evidence to rebut this presumption, nor did she address the presumption in her brief. The district court did not err in finding a presumption of unfitness applies pursuant to K.S.A. 38-2271(a)(6).

*Foreseeability*

Having found that the district court did not err in finding Mother unfit, we now examine the district court's determination that the conduct or condition that is the cause of the unfitness is unlikely to change in the foreseeable future. "After finding a parent is unfit to properly care for a child, the court must then determine whether there is clear and convincing evidence that the parent's conduct or condition of unfitness is unlikely to change in the foreseeable future." *In re D.G.*, 319 Kan. 446, 459, 555 P.3d 719 (2024); see K.S.A. 38-2269(a).

When reviewing the foreseeable future, this panel must use "child time" rather than "adult time" as the measure. See *In re N.A.C.*, 299 Kan. 1100, 1106, 329 P.3d 458 (2014). The revised Kansas Code for Care of Children recognizes that children experience time differently and delays can result in a disruption in their routine and emotional stability, which is critical to their well-being. See K.S.A. 38-2201(b)(4). Thus, we may look at a parent's past conduct as an indicator of future behavior, which requires prompt permanent disposition. *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982).

As to foreseeability, the district court found:

"As to the foreseeable future, looking at child time, these children have a right to permanency within a reasonable time frame, in their perception of reasonable time. These children have been in foster care since 2018. With that, the mother has had six years to get to a point of fitness. Despite the efforts of the agency and the time that the mother has been afforded, she is still unable to provide her children with the stability that they need and that they are entitled to. Again, looking at past conduct to predict future conduct, the mother's conduct or condition is unlikely to change in the foreseeable future."

20

The evidence in this case is that while Mother undoubtedly cared about her children, she did not take the necessary steps to complete case plan tasks so the children could return to her home. See *In re K'L.V.P.*, No. 118,415, 2018 WL 3194011, at *6 (Kan. App. 2018) (unpublished opinion) ("[a] parent's actions, not intentions, are the measure to be used in determining likelihood of change in the foreseeable future").

The evidence at the hearing was that Mother had worked on case plan tasks for over six years. Despite Mother's best intentions, those who worked closely with Mother testified they did not believe Mother could parent the children in the foreseeable future. Dr. Hazel testified that even after six years, he had concerns about Mother's ability to care for her children. Simon testified that based on her observations of Mother's performance over the past three years, she did not believe that Mother would likely change. The record supports this factual finding as well. Mother's parental rights to another child were previously terminated, and Mother failed to complete critical case plan tasks related to mental health, visitation, and housing.

Considering the evidence in the light most favorable to the State, we conclude that it is highly probable that Mother's conduct or condition of unfitness is unlikely to change in the foreseeable future. K.S.A. 38-2269(a); *In re D.G.*, 319 Kan. at 459.

*Termination of parental rights is in the best interests of the children.*

K.S.A. 38-2269(g)(1) provides:

"If the physical, mental or emotional needs of the child would best be served by termination of parental rights, the court shall so order. A termination of parental rights under the code shall not terminate the right of a child to inherit from or through a parent. Upon such termination all rights of the parent to such child, including, such parent's right to inherit from or through such child, shall cease." K.S.A. 38-2269(g)(1).

21

We examine the factual findings made by the district court that support a best interests decision under an abuse of discretion standard.

> "Given the discretion inherent in this determination, Kansas appellate courts have generally reviewed a district court's termination decision for an abuse of discretion. See K.S.A. 38-2269(a) (providing a court *may* terminate a parent's rights after a sufficient finding of unfitness that is unlikely to change in the foreseeable future). At this final stage, the issue is not whether the parent's rights *can* be terminated, the issue is whether—based on the child's needs—the parent's rights *should* be terminated. Under this well-known standard, a district court abuses its discretion if its decision is 'arbitrary, fanciful, or unreasonable,' or based on an error of fact or law. [Citations omitted.]" *In re K.W.D.*, 321 Kan. 100, 116, 573 P.3d 221 (2025).

Here, the district court held, "[r]eintegration is no longer a viable alternative and, giving primary consideration to the physical, mental and emotional needs of these children, termination of the mother's parental rights is in the best interest of these children pursuant to K.S.A. 38-2269(g)."

Immediately prior to making this finding, the district court noted that the children had been in foster care since 2018, and that the children had a right to permanency within a reasonable time frame. ur at the hearing was that continued contact with Mother was emotionally harming the children, and that the children needed stability due to their own medical and behavioral needs. N.G. suffers from Type 1 diabetes and requires constant care. D.G. suffers from behavioral issues and has been placed in 14 different foster homes as of the termination hearing. We find no abuse of discretion here. A reasonable person could agree with the district court's conclusion, and we do not find that the district court's conclusion was based on any factual or legal error.

DID THE DISTRICT COURT ABUSE ITS DISCRETION BY FAILING TO COMPLY WITH EXPERT WITNESS REQUIREMENTS UNDER K.S.A. 60-226(b)(6)?

For her second issue on appeal, Mother contends that the district court erred by considering the testimony of Dr. Hazel and Jori Simon. She contends that their testimony regarding Mother's fitness as a parent constituted expert testimony and therefore required the State to comply with the expert witness requirements set forth in K.S.A. 2024 Supp. 60-226(b)(6).

*Standard of Review*

Appellate courts review a district court's decision to admit or exclude expert testimony for an abuse of discretion. *In re E.L.*, 61 Kan. App. 2d at 341. A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *In re A.S.*, 319 Kan. 396, 400, 555 P.3d 732 (2024).

*Discussion*

The Revised Kansas Code for Care of Children governs discovery and evidentiary matters in CINC cases. In such instances, courts have held that the civil discovery procedures outlined in K.S.A. 60-226, including expert witness disclosure requirements, do not automatically apply in CINC proceedings. *In re E.L.*, 61 Kan. App. 2d at 341. Instead, K.S.A. 38-2245(a) provides: "After a hearing and a finding that discovery procedures, as described in K.S.A. 60-226 through 60-237, and amendments thereto, will expedite the proceedings, the judge may allow discovery subject to limitations." K.S.A. 38-2245(a). This distinction is made to prioritize the safety and welfare of children and allows for a more flexible evidentiary approach. See K.S.A. 38-2201(b)(1).

Mother argues that allowing Dr. Hazel and Simon's testimony was an abuse of discretion because it was a misapplication of the law. Mother believes that the proper remedy for failing to comply with the expert witness disclosure requirement is to reverse the district court's decision to terminate Mother's parental rights.

*In re E.L.* presented a similar issue where a mother challenged the admission of expert testimony on the grounds that the State failed to disclose the expert under K.S.A. 60-226(b)(6). This court held that the civil discovery rules, including expert disclosure requirements, only apply after a hearing and a finding that such procedures would expedite the case. No such hearing or finding had occurred, and the mother did not request one. Thus, a panel of our court found no abuse of discretion in admitting the expert testimony. 61 Kan. App. 2d at 341-42.

Further, in the case of *In re B.H.*, 64 Kan. App. 2d 480, 500-01, 550 P.3d 1274 (2024), this court emphasized the importance of providing parties with sufficient notice to review expert reports before hearings. In that case, the mother objected to the fairness of cross-examining an expert witness because she had not seen the report until the day of the hearing. 64 Kan. App. 2d at 485-86. Mother had ample time to review Dr. Hazel's report and prepare for the hearing. Dr. Hazel conducted a psychological evaluation of Mother. It is uncontroverted that Mother received Dr. Hazel's report in September 2023—over a year before the termination hearing took place. And Mother was on notice that the State would rely on Dr. Hazel's opinions when the motion to terminate her parental rights was filed. This extended notice alleviates any potential due process concerns related to the timing of the disclosure. Here, there was no error of law or fact, and a reasonable person could agree with the district court's decision. The district court did not abuse its discretion in admitting Dr. Hazel's report.

24

Mother also contends that the district court abused its discretion in considering the testimony of Simon, the case manager, because her testimony extended beyond observation into expert opinion. Mother's argument is unpersuasive for several reasons.

First, civil discovery rules, including expert disclosure requirements, only apply in a CINC case after a hearing and a finding that such procedures would expedite the case. K.S.A. 38-2245(a); *In re E.L.*, 61 Kan. App. 2d at 341-42. No such hearing or finding occurred in this case.

Second, Mother's counsel at the termination hearing stipulated that Simon was not an expert witness. "Judge, I would stipulate to her qualifications. She's not testifying as an expert, and this court is pretty familiar with the witness." Yet, on appeal, Mother has taken the position that Simon was an expert witness. Mother fails to explain why her position has changed, or why we should consider this argument for the first time on appeal. "'If the issue was not raised below, there must be an explanation why the issue is properly before the court.'" *Schutt v. Foster*, 320 Kan. 852, 856, 572 P.3d 770 (2025).

Third, Simon is a lay witness. Under K.S.A. 2024 Supp. 60-456(a), a lay witness may provide opinions or inferences if they are rationally based on their own perceptions and helpful to understanding their testimony. In *State v. Ballou*, 310 Kan. 591, 606-07, 448 P.3d 479 (2019), the court distinguished between a lay witness and expert testimony, finding that lay testimony must not be based on scientific, technical, or specialized knowledge. Simon's testimony at the termination hearing was clearly based on her first-hand observations of Mother over three years as she worked the case plan. None of Simon's opinions were based on scientific, technical, or specialized knowledge. The district court properly treated Simon as a lay witness, and there was no requirement under K.S.A. 2024 Supp. 60-226 (b)(6) to disclose her testimony prior to the hearing.

Affirmed.