NOT DESIGNATED FOR PUBLICATION

No. 129,033

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of Q.R., a Minor Child.

MEMORANDUM OPINION

Appeal from Geary District Court; AMY C. COPPOLA, magistrate judge. Submitted without oral argument. Opinion filed December 12, 2025. Affirmed.

*Laura E. Poschen*, of Poschen Law, LLC, of Wichita, for appellant natural mother.

*Krista Blaisdell*, county attorney, for appellee.

Before ARNOLD-BURGER, P.J., MALONE and BOLTON FLEMING, JJ.

PER CURIAM: When Q.R. was two years old, she was placed in police protective custody after being found alone in a home where she lived with her mother. A child in need of care (CINC) case was filed, and Mother was given an opportunity to work on case plan tasks geared toward reintegration. While Mother completed some case plan tasks, she failed to complete the tasks that were critical to Q.R.'s return home. Mother also moved to Georgia without notice to her caseworkers, making reintegration more difficult. After Q.R.'s case had been pending for about 13 months, the district court terminated Mother's parental rights.

After a thorough review of the record, we find that clear and convincing evidence supports the district court's decision that Mother was statutorily unfit pursuant to K.S.A. 38-2269 and that the conduct or condition causing her unfitness was likely to continue for the foreseeable future. Because Mother was unfit under this independent statutory basis,

1

we need not consider whether any presumptions of unfitness apply pursuant to K.S.A. 38-2271(a). Moreover, the district court did not abuse its discretion in finding termination of Mother's parental rights was in Q.R.'s best interests. Accordingly, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Q.R. was born in February 2021. On July 21, 2021, when Q.R. was around five months old, Mother brought Q.R. to work with her at the Fort Riley, Kansas military base. After arriving at work, Mother left Q.R. inside a utility closet in the dining hall while she left base to get a driver's license. Another employee found Q.R. in the closet, and the military police were contacted. During an investigation, Mother stated that other people brought their kids to work, and she thought someone there was watching Q.R. No CINC case was filed related to this first incident.

A second incident followed. On October 26, 2022, when Q.R. was about 20 months old, she was found home alone by a maintenance crew for Wildcat Apartments in Junction City, Kansas. A member of the crew contacted law enforcement, and Officer Jeremiah Ruffin, an officer with the Junction City Police Department, responded. Officer Ruffin remained at the apartment for 45-60 minutes before contact was made with Mother. Mother first explained that she left Q.R. alone while running to Walmart but then changed her story to say she was in the process of moving out of the apartment. Mother elaborated that she had been moving heavy items and thought it was better to leave Q.R. at home than in the car with heavy items. As a result of this incident, Q.R. was taken into protective custody, and a CINC case was filed—22JC67. After Mother completed some of her case plan tasks, Q.R. returned to live with her on June 15, 2023. The case was closed on November 1, 2023—13 days before the present case was filed. As a result of this second incident, Mother was charged with child endangerment and entered a diversion agreement. Later, this diversion was revoked when Mother was again charged with child endangerment.

In the present case, Q.R. was placed in protective custody on November 14, 2023, after Geary County Sheriff's Deputy Mark Maschmeier found her alone in the trailer where she lived with Mother. This was the third incident where Mother had left Q.R. alone at a very young age. Deputy Maschmeier was attempting to serve Mother eviction paperwork and noticed a child alone in the residence. Officer Devin Stamm from the Junction City Police Department was called to assist, and he remained at the residence for approximately 30 minutes before Mother returned. Upon her return, Mother told the officers that the neighbor was watching Q.R.—a story the neighbor denied. Mother stated she had left Q.R. in the trailer while she went to pay rent to her landlord to try to avoid eviction. Officer Stamm observed that Mother appeared nonchalant and did not appear to believe leaving Q.R. was a problem. Q.R. was taken into police protective custody and a CINC petition was filed. Mother was also charged and convicted of a second count of child endangerment.

As part of the services provided by the State to Mother, a case planning conference was held on December 7, 2023. The Department for Children and Families (DCF) assigned Saint Francis Ministries (SFM) to provide case management. The case plan included tasks from the previous CINC case that were ongoing:

- complete all intake paperwork, release of information, and provide all other documents requested by DCF, SFM, and the court;
- comply with all court orders in the CINC case as well as any domestic or criminal cases that may occur;
- maintain weekly contact with the case team at a minimum and inform the case team of any life changes to include changes in employment and changes in housing or contact information;
- complete a mental health intake, paid by SFM, and follow all recommendations to include therapy, medication management, or any other recommended services;

3

- obtain and maintain safe appropriate housing and provide documentation of such to SFM;
- obtain and maintain legal income and provide documentation of such to SFM;
- attend a parenting education course, paid by SFM, and provide SFM documentation of completion and utilize the learned skills during visits with the child;
- complete a parent/child assessment, paid by SFM, and follow any recommendations;
- submit random UAs as requested by SFM, DCF, or the court; and
- provide the case team with possible name(s) for the unknown father.

Mother was also given new tasks:

- provide the case team with information to start the ICPC Regulation 7 process;
- participate in Parents as Teachers with Q.R.; and
- complete a Psychological Evaluation and follow all recommendations.

On February 7, 2024, the parties appeared for an adjudication hearing. Mother entered a no contest statement and Q.R. was adjudicated a child in need of care. The district court found reintegration remained viable.

As the case progressed, the district court found Mother's progress was inadequate and reintegration was no longer viable. The State filed a motion to terminate Mother's parental rights on September 6, 2024. The termination hearing was held on December 11, 2024.

*Termination Hearing*

During the termination hearing, the district court took judicial notice of both the present CINC case as well as the prior CINC case—22JC67. Q.R.'s father was never definitively identified. The parental rights possessed by any unknown father were terminated as part of the proceeding.

As a part of the termination hearing, the district court heard evidence from multiple witnesses.

*Officer Devin Stamm*

Officer Devin Stamm of the Junction City Police Department testified that on November 14, 2023, he was called to assist a Geary County Sheriff's deputy who had observed Q.R. alone in a trailer. Officer Stamm testified he was at the residence for 30-45 minutes before Mother returned. Mother was later convicted of child endangerment and that journal entry was entered into evidence.

*Officer Jeremiah Ruffin*

Officer Jeremiah Ruffin of the Junction City Police Department testified about the incident that formed the basis of the prior CINC case. Officer Ruffin stated that on October 26, 2022, he was called to Wildcat Apartments by a maintenance crew concerning an unattended child at an apartment. Officer Ruffin testified that he was at the apartment for 45 minutes before he was able to contact Mother. Officer Ruffin was able to find Mother by contacting a man who was listed on the lease. The leaseholder said that Mother had been staying there and provided her contact information. Mother was contacted and she told Officer Ruffin that she was at Walmart and was on her way home. Officer Ruffin cited Mother with child endangerment and placed Q.R. into police

5

protective custody. The citation, Mother's diversion agreement, and the State's motion to revoke diversion were entered into evidence.

*Yesenia Anderson, DCF*

Yesenia Anderson, a child protective care specialist for DCF, testified about her involvement with the case.

Anderson held a team meeting with Mother shortly after Q.R. was taken into police protective custody. Mother told Anderson that she was working night shifts at Valley View and that a neighbor checked in on Q.R., but there was no other supervision. Anderson testified that she told Mother there were services available to help.

Anderson testified about the prior times Mother had left Q.R. alone. DCF decided that Q.R. would be placed out-of-home due to being left alone a total of three times at a very young age. Q.R. had only been back in Mother's care for two weeks when the most recent instance of being left unsupervised occurred. It was apparent to Anderson during the team meeting that Mother did not understand the level of supervision required for a two-year-old child. Anderson testified that she was concerned about "the history of [Mother] leaving the child alone."

*April Palya, Saint Francis Ministries*

April Palya, a forensic psychologist working for SFM, testified that she was a reintegration supervisor for a portion of Q.R.'s prior CINC case and acted as the case manager in the present case from November 2023 to July 2024. In the prior case, 22JC67, Q.R. was in foster care for approximately nine months. She reintegrated into Mother's home and had been in Mother's care approximately two months when the case was closed. After the case was closed, Mother was offered aftercare services. Mother failed to

utilize those services, and SFM had to request a welfare check because Mother would not communicate. About two weeks after the first case was closed, Q.R. was again removed from Mother's home for lack of supervision.

*Case Plan Tasks*

After Q.R. was removed from Mother's home in November 2023, Palya started working with Mother again to complete case plan tasks geared toward reintegration. As they reviewed the case plan tasks, Mother told Palya she had no intention of repeating any of the tasks that she had been asked to complete in the prior case, such as Parents as Teachers. Palya explained that these services would need to be repeated because Q.R. was placed back in foster care due to Mother's lack of supervision.

*Psychological Evaluation and Mental Health Treatment*

Palya testified that the district court ordered a psychological evaluation because Mother did not understand the risk of leaving a small child alone. SFM believed that Mother might have a learning disability and thought a psychological evaluation would be helpful.

SFM set up an appointment at Flint Hills Neuropsychology to complete the evaluation, but Mother failed to attend. Mother claimed that she missed the appointment because her vehicle had been stolen while in Oklahoma, but she was unable to provide a police report. Flint Hills Neuropsychology was unwilling to reschedule Mother, so SFM scheduled a psychological evaluation for Mother at their own SFM outpatient behavioral clinic. Mother moved to Georgia without notifying the case team and did not attend this appointment. At the time of the termination hearing, Mother had failed to complete the psychological evaluation.

Mother completed a mental health evaluation during the first CINC case but did not complete one in the present case while Palya was involved, although another witness believed Mother may have completed this task in Georgia. Palya testified that Mother never comprehended the importance of properly supervising a young child.

*Visitation*

Palya testified that Mother attended her first visit with Q.R. on December 14, 2023. Mother then missed the next scheduled visit on December 22, 2023, without providing a reason. Q.R. was already at the SFM office on that date, waiting for her visit.

The next visit was on December 29, 2023. Mother was late but attended. Mother then cancelled a January 5, 2024 visit without giving a reason. A visit scheduled for January 12, 2024, was cancelled by SFM due to bad weather. The next scheduled visit was January 19, 2024, which Mother cancelled. Mother attended the next visit on January 24, 2024, which occurred in Junction City, Kansas, because Mother was staying there with friends.

Mother then participated in a visit on January 31, 2024, and brought an unidentified male to the visit. The next visit on February 7, 2024, fell around Q.R.'s birthday, but Mother failed to bring anything to the visit to celebrate or acknowledge the event. From then on, Q.R.'s foster parents sent gifts to visitation so that Mother could celebrate special occasions with Q.R.

Mother was more than 15 minutes late for a visit scheduled on February 14, 2025. This pattern continued—with Mother missing visitations or being late—until she moved to Georgia in the summer of 2024. And when visits did occur, Mother was often distracted by talking with others on her phone and participating in video calls. There were also issues with Mother appropriately supervising Q.R. during the visits. Mother never

8

progressed from supervised visits and at the time of the termination hearing was only visiting with Q.R. by video and an occasional visit in Kansas when Mother would return related to her criminal cases. Palya testified that the visits could not progress because Mother did not appropriately supervise Q.R. during the supervised visits and Mother did not reside in a safe place where visits could be held in her home.

*Housing*

Palya testified that Mother failed to maintain appropriate housing throughout the case. Palya testified that there was never a point in the case where Mother "had fully stable housing that she was able to reside in legally in which she was not fully dependent on someone else's grace to allow her to stay." Mother moved multiple times, including to a different state, Georgia, during the case.

When Q.R. was removed from Mother's home in November 2023, Mother was evicted shortly after. Mother then went to live with friends "on Deerfield Boulevard." Mother was unwilling to share information about the case with her friends, and as a result, SFM could not confirm Mother's living conditions. Mother did not appear on the lease.

Mother then moved to live "on Post" at Fort Riley. Mother lived with a significant other but could not be approved for housing on the base. A domestic incident occurred between Mother and her significant other, and Mother could no longer stay on the base. Mother then moved to stay with friends for an interim period.

At the time of the termination hearing, Mother lived in Stone Mountain, Georgia, in her deceased father's home with Q.R.'s maternal grandmother, an aunt, and the aunt's four children. Nothing was known about the size or condition of the home.

*Employment*

Palya testified that for most of the case, Mother failed to maintain meaningful employment. In November 2023, Mother was employed at a care facility called Valley View, but by late January 2024, Mother refused to answer questions about her employment.

*Communication*

Palya testified that Mother failed to keep in contact with the SFM team assigned to help her. Palya stated that SFM tried to work with Mother on obtaining daycare and understanding proper supervision for a young child, but Mother failed to keep in contact with SFM and often would not give SFM correct information.

Palya also testified that despite many efforts by SFM that spanned over two CINC cases, Mother could never understand why leaving a young child unsupervised was an issue. Palya testified,

> "[a]nd that's why we kept getting stuck because that is a huge safety issue for the child's age. I mean, she could get ahold of a sharp object, stick her finger in something she shouldn't be, she could potentially even get a door unlocked if she could reach it and leave the home and residence and be completely unattended in nature and it's, you know, November, it's cold and she would freeze to death potentially."

Mother could never verbalize that she understood the importance of supervision, which according to Palya was important because Mother had left Q.R. unsupervised for extended periods of time on three documented occasions prior to Q.R. turning three years old.

Palya stated that despite having case plan tasks to complete in Kansas, Mother moved to Georgia in June or July of 2024 without giving any notice to SFM. Mother had mentioned that she would like to go visit her family and initially stated that she was going to visit her family in Georgia. Mother claimed she would return in "a week or two" but eventually told SFM she would not be returning to Kansas.

*Interstate Compact on the Placement of Children (ICPC)*

Palya testified that an ICPC was considered for both Q.R.'s maternal grandmother and a maternal aunt. The maternal grandmother could not start the process because she did not have a permanent address. The maternal aunt applied for ICPC approval but was denied for multiple reasons. An ICPC was also considered for Mother after she moved to Georgia so that Mother could have support while continuing to work on case plan tasks there. But officials in Georgia did not consider Mother a resident because she had not resided there for six months, and there was some question as to who owned the home where Mother was residing. Because Mother had pending criminal charges and did not have a permanent residence in Georgia, Palya did not believe ICPC approval was likely.

*Completed Case Plan Tasks*

Palya testified that Mother completed several case plan tasks. She noted that Mother completed a random UA and SFM did not see need for additional tests. Mother also completed her intake paperwork and completed the requested releases except for Parents as Teachers, as Mother refused to participate in that service in the present case. Mother was successful in the Parents as Teachers program during the first CINC case. Mother also followed her orders from her criminal cases.

*Best Interests of Q.R.*

At the termination hearing, Palya testified that Mother never recognized or understood the significance of leaving Q.R. alone at her age. She testified that Mother could not tell her that she understood that a "person needs to be in that house with the child at all times." Palya also testified about harm that could come to Q.R. if Mother continued to leave Q.R. unsupervised.

Palya noted that when Q.R. was reunified with Mother in the prior CINC case, she was fully potty trained, sleeping through the night, and using two-word sentences. When she was removed again in November 2023, Q.R. had regressed, had night terrors, and was wearing diapers again. After being removed from Mother's home and placed back in foster care, Q.R. started to make strides again, and is now mostly potty trained and using short sentences.

Palya opined that reintegration was not possible "in a reasonably foreseeable timeframe given that mom is not residing in Kansas and is not able to have those in-person visits so that we can determine whether any safety issues still exist that haven't been addressed."

*Melissa Price*

Price testified as a reintegration case manager for SFM. She testified that she took a more active role in Q.R.'s case as Palya transitioned to another position. Price worked with Mother for a couple of months before Mother moved to Georgia.

Price testified that a psychological evaluation was set for Mother at Flint Hills Neuropsychology in May of 2024, but Mother did not attend. At that time, Mother stated that she was in Oklahoma, and her vehicle was stolen. SFM tried to reschedule the

appointment, but Mother indicated that she was no longer in Kansas. Price testified that Mother told her she could have the court-ordered psychological evaluation done in Georgia for $5,000, but according to Price, that amount was not approved because it was unreasonable. SFM would have paid Flint Hills Neuropsychology $1,500 had Mother attended that appointment. Price could not confirm what SFM had done to help facilitate the evaluation once Mother moved to Georgia, but confirmed that Mother could have done the evaluation during one of her return trips to Kansas for her criminal court cases. Price believes that Mother did a mental health assessment in Georgia but has been unable to confirm this in writing. Price has received a single "after-visit summary" from a provider but has not seen any assessment.

Price described the visits that have occurred since Mother moved to Georgia. These visits occur between Mother and Q.R. primarily by Zoom, but Price works with Mother to schedule an in-person visit if Mother comes to Kansas for her criminal cases.

Price testified that Mother confirmed her present address in Stone Mountain, Georgia, the day before the termination hearing but had not responded previously to confirmation requests. Mother has not provided any documentation to confirm her housing but told Price she continues to reside with family. Mother's lack of stable housing has been a central issue in the case. Mother was evicted from her trailer she was living in when this CINC case began. Throughout the case she stayed at Fort Riley without approval, and with several friends. Mother reported that she had moved to Savannah, Georgia, and now purportedly lives in Stone Mountain, Georgia. Mother lived with a friend in Georgia for a short time and then moved in with her mother and other family members. Mother is currently searching for an apartment. SFM has never been able to confirm that Mother has a safe and stable home for Q.R. Price also testified that Mother has had a job for the last few months. Mother's employer was not willing to confirm this information, but Mother provided pay stubs from that employment.

13

Price testified that she believed Mother's rights should be terminated due to the lack of progress made in Q.R.'s case.

*Foster Mother*

Foster Mother, Q.R.'s foster parent and an interested party, also testified. Q.R. was placed with her during the first CINC case for around 8 months. In the present CINC case, Q.R. had been placed with her for approximately 13 months as of the termination hearing.

Foster Mother testified that when Q.R. was returned to her home for foster care placement in November 2023, Q.R. had regressed in her behavior. When Q.R. originally left Foster Mother's care to return to Mother, Q.R. had been sleeping well and was potty trained. But when Q.R. was removed from Mother's care and placed with Foster Mother in November 2023, Q.R. had night terrors and was no longer potty trained.

At the time of the termination hearing, Q.R. was almost 4 years old and had spent 21 months of her life placed with Foster Mother. Q.R. participates in Sunday school, swimming, and gymnastics. Mother Foster stated that Q.R. has adjusted well and is showing progress, especially due to having a schedule and routine.

*Mother*

Mother testified on her own behalf. Mother testified that she left Q.R. alone on two occasions. She testified that she now knows that is wrong. Mother testified that on the first occasion she left Q.R. at home while moving so she didn't get struck by the furniture. Mother testified that in November 2023, she left Q.R. alone again, believing she could run to Walmart to get a money order and to the leasing office to pay rent before

Q.R. woke up. Mother acknowledges that both CINC cases arose from failing to supervise Q.R.

Mother acknowledged that at the time of the termination hearing, she was on probation for her two child endangerment cases. These cases arose from Mother failing to supervise Q.R.

Mother described that shortly after Q.R. was removed from her home, she was evicted from her trailer. After that, Mother stayed with friends and in the barracks at Fort Riley with a significant other until moving to Georgia in July 2024. Mother also acknowledged that she moved to Georgia without telling her probation officer, attorney, or case team. Mother testified that she did not have a support system in Kansas but had lived here since 2019. When Mother went to Georgia, she first lived with a friend and then with Q.R.'s maternal grandmother, a maternal aunt, and the aunt's four children. Mother does not plan to live with the maternal grandmother on a long-term basis and has been looking for an apartment.

Mother testified that around the time this case began in November 2023, she was working at Via Christi in Manhattan and then took a job at Valley View. She testified that her job at Valley View ended because there was "a lot of stuff going on there" and "if my job keeps telling me to go home, then what is the reason that I would stay there." Mother admitted she did not have further employment in Kansas. Mother provided an employment offer letter dated August 19, 2024, with Mission Health. Mother testified that she did not pass the background check due to her criminal cases in Kansas. She started a job as a dispatcher for a trucking company on September 27, 2024, earning $17.94 per hour. Her first two-week paycheck showed 64 hours worked. Mother intends to rely on family to help with Q.R.'s care.

Asked about her ability to return to Kansas for visits with Q.R., Mother said it didn't make sense because she was trying to save money for her own apartment. When Mother returned to Kansas for her criminal court hearing, she let her case manager at SFM know the day before at 4:28 p.m. and requested to see Q.R. SFM arranged a visit, but Mother was 30 minutes late.

Mother claimed she had applied for benefits for Q.R. in Georgia, including childcare, money assistance, and health insurance, but had no proof such as a card. Mother did not indicate whether she shared the fact that Q.R. was in state custody in Kansas with Georgia authorities.

Mother testified that she continues to work and is willing to pay part of daycare costs and to travel for any evaluation. Mother said she remains committed to completing the psychological evaluation and starting in-person visitation.

*Guardian Ad Litem Recommendation*

The guardian ad litem recommended that the district court terminate Mother's parental rights based on the fact reintegration was not going to occur in the foreseeable future and that it was in Q.R.'s best interests to have permanency. The guardian ad litem noted that Mother has "not met the case plan tasks and has not been able to evolve her parenting to the point where we can adequately ensure [Q.R.]'s safety if placed with mom."

*District Court Decision*

The district court found clear and convincing evidence that Mother was "unfit by reason of conduct or condition[] which renders the parent unable to care properly for the

child and the conduct or condition is not likely to change in the foreseeable future." The district court specifically found:

"[T]here was physical, mental or emotional abuse or neglect or sexual abuse of this child pursuant to K.S.A. 38-2269 (b)(4).That this mother was specifically convicted twice of child endangerment; (b)(8) that there is a lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the child's needs; that this child has been out of home placement for the last 13 months, before that she was out of placement, for about eight to nine months, um, and that whether as a result of the actions or inactions of the parent, and one or more of the factors listed in K.S.A. 38-2269 (C) apply, the child has been in the custody of the secretary and placed with neither parent for 15 of the most recent 22 months beginning 60 days after the date on which a child in the secretary's custody was removed from the child's home; (c)(1) that there is been a failure to assure the care of the child in the parental home when able to do so; (c)(2) that there has been a failure to maintain regular visitation, contact and communication with the child, or with the custodian of the child, very specifically this mother chose to leave the state of Kansas in July, and provided no notification to her St. Francis case worker, or even her attorney; (c)(3) that there has been a failure to carry out a reasonable plan, approved by this court directed toward reintegration of the child, very specifically, this Court ordered that there would be a psychological evaluation in January of this year and it's still been uncompleted. Considering the physical, mental or emotional health of the child, termination of parental rights is in the best interests of the child named above and the physical, mental or emotional needs of the child would best be served by termination of parental rights, therefore the parental rights of [Mother] should be terminated today. This court further finds, pursuant to K.S.A. 38-2271 (a)(3) that there were two prior adjudications on [t]his mother for the physical neglect of this child and (a)(5) that this child has been an out of placement for more than 12 months and that both parents have failed to carry out a reasonable plan of reintegration and mother has not rebutted that presumption today."

Mother timely appeals.

ANALYSIS

*Did the District Court Err in Terminating Mother's Parental Rights?*

*Standard of Review*

"Termination of parental rights will be upheld on appeal if, after reviewing all the evidence in the light most favorable to the prevailing party, the district judge's fact-findings are deemed highly probable, i.e., supported by clear and convincing evidence. Appellate courts do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact." *In re Adoption of Baby Girl G.*, 311 Kan. 798, 806, 466 P.3d 1207 (2020).

Clear and convincing evidence is evidence that shows that the truth of the facts asserted is highly probable. *In re B.D.-Y.*, 286 Kan. 686, 695-96, 187 P.3d 594 (2008).

*General Principles*

Once a child has been adjudicated to be a child in need of care, the district court may terminate parental rights "when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 38-2269(a). K.S.A. 38-2269(b) and (c) contain a list of nonexclusive factors the court can consider in determining parental unfitness. "The existence of any one of the above factors standing alone may, but does not necessarily, establish grounds for termination of parental rights." K.S.A. 38-2269(f).

In addition, a parent may be presumed unfit if the State establishes, by clear and convincing evidence, one of the circumstances listed in K.S.A. 38-2271(a). Once established, the burden "is on the parent to rebut the presumption of unfitness by a preponderance of the evidence." K.S.A. 38-2271(b).

Finally, upon making a finding of unfitness of the parent, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 38-2269(g)(1). In making such a decision, the court shall give primary consideration to the physical, mental, and emotional health of the child. K.S.A. 38-2269(g)(1).

*Statutory Unfitness*

The district court found that clear and convincing evidence existed that Mother was "unfit by reason of conduct or condition, which renders the parent unable to care properly for the child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 38-2269(a). The district court found Mother unfit under the following statutory factors:

- physical, mental, or emotional abuse or neglect or sexual abuse of a child (K.S.A. 38-2269[b][4]);
- lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child (K.S.A. 38-2269[b][8]); and
- as a result of the actions or inactions attributable to the parent, and one or more of the factors listed in subsection (c) apply, the child has been in the custody of the Secretary and placed with neither parent for 15 of the most recent 22 months beginning 60 days after the date on which a child in the Secretary's custody was removed from the child's home (K.S.A. 38-2269[b][9]).

The district court further found that Q.R. was not in Mother's custody, and Mother was unfit due to additional statutory factors:

19

- Failure to assure care of the child in the parental home when able to do so (K.S.A. 38-2269[c][1]);
- failure to maintain regular visitation, contact, or communication with the child or with the custodian of the child (K.S.A. 38-2269[c][2]); and
- failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home (K.S.A. 38-2269[c][3]).

We first consider whether viewed in a light most favorable to the State, clear and convincing evidence supports the district court's findings under these statutory factors.

*K.S.A. 38-2269(b)(4)*

The district court found that Mother's actions constituted physical, mental, or emotional abuse or neglect.

K.S.A. 2024 Supp. 38-2202(z) provides, in relevant part:

"'Neglect' means acts or omissions by a parent, guardian or person responsible for the care of a child resulting in harm to a child, or presenting a likelihood of harm, and the acts or omissions are not due solely to the lack of financial means of the child's parents or other custodian. Neglect may include, but shall not be limited to:
    (1) Failure to provide the child with food, clothing or shelter necessary to sustain the life or health of the child;
    (2) failure to provide adequate supervision of a child or to remove a child from a situation that requires judgment or actions beyond the child's level of maturity, physical condition or mental abilities and that results in bodily injury or a likelihood of harm to the child."

The evidence in this case is that Mother left Q.R. unsupervised on three different occasions. Each occasion was of such significant length and concern that intervention

20

was required. First, when Q.R. was around five months old, Mother left her in a closet at work while she left to obtain a driver's license. That incident led to an investigation by military police at Fort Riley. On the second occasion, when Q.R. was only one year old, Mother left her alone while she went to Walmart, and while moving large items. On this second occasion, a maintenance crew at Mother's apartment noticed Q.R. and called the police. This incident led to Mother being charged with child endangerment. She entered a diversion agreement on that charge that was eventually revoked. A CINC case was also filed.

Yet, Mother's behavior continued. On a third occasion, when Q.R. was around two years old, Mother left her alone again—this time in a trailer. When a deputy came to the trailer with eviction papers for Mother, he found Q.R. Mother claimed a neighbor had agreed to watch Q.R., but the neighbor denied this arrangement. This incident led to a second CINC, filed only 13 days after the first CINC was terminated, and another child endangerment charge and conviction. All three of these incidents occurred prior to Q.R. turning three years old.

Clear and convincing evidence supports the district court's finding that Mother is unfit pursuant to K.S.A. 38-2269(b)(4). Mother neglected Q.R. on three separate occasions by failing to provide adequate supervision, especially considering Q.R.'s young age. See K.S.A. 38-2202(z)(2).

*K.S.A. 38-2269(b)(8)*

The district court found that Mother failed to adjust her circumstances, conduct, or conditions to meet the needs of the child. K.S.A. 38-2269(b)(8).

Shortly after this case was filed, Mother was given case plan tasks to complete so that Q.R. could be reintegrated into her home. One of those tasks was to obtain

appropriate housing. But the evidence at the termination hearing was that Mother had moved multiple times while the CINC case was pending. She was evicted from her trailer as the case began, and then stayed with friends, but was never a party on any lease. At one point Mother started staying at Fort Riley in the barracks with a significant other but did not have permission to stay there. Then, without notice to her case workers, Mother moved to Georgia. On arriving in Georgia, Mother first stayed with a friend and then with her mother, Q.R.'s maternal aunt, and the aunt's four children. At the termination hearing, Mother testified that she does not intend to permanently stay with her mother and is searching for an apartment. Mother did not successfully obtain and maintain stable housing that would allow Q.R. to reintegrate into her home.

Another case plan task was to obtain and maintain gainful employment. The evidence before the district court was that while Mother was employed at Valley View when the case originated, she lost that job. She did not work again while living in Kansas. Once in Georgia, she applied for a job but was disqualified due to her criminal charges and CINC case. In September 2024, she obtained employment. For most of the time this case has been pending, Mother has not been gainfully employed.

A critical case plan task was to obtain a psychological evaluation. This was never completed by Mother. This case plan task was critical because despite long periods of intervention by SFM, Mother consistently demonstrated that she did not comprehend the risks associated with leaving Q.R. alone. Her case workers believed Mother might suffer from a learning disability that was interfering with her ability to learn to parent. The evidence was that Mother had a psychological evaluation scheduled but failed to appear. Mother's explanation was that her car was stolen, but she did not provide a police report to document this claim. SFM then made arrangements for the psychological evaluation to be conducted at one of their own clinics, but Mother left Kansas before this could be completed. Mother claims she attempted to complete this task in Georgia, but the evidence only demonstrates she contacted a provider that would charge $5,000 for an

22

evaluation. Mother also did not explain why she did not complete the evaluation in Kansas when she came back for her criminal proceedings.

Mother also did not complete the case plan task of participating in visitation with Q.R. The evidence was that visits were always supervised and conducted at the SFM office or in the community. The visits could not progress to Mother's home because she did not have a safe home for any period while residing in Kansas. Moreover, Mother missed many appointments and was significantly late to others. When Mother did attend a visit, she was often distracted by her phone. Mother did not successfully complete this case plan task.

In the end, Mother failed to adjust her circumstances to meet the needs of her child. She was unable to provide consistency for Q.R. through stable housing, employment, visitation, and required psychological care. Viewed in a light most favorable to the State, clear and convincing evidence supports the district court's decision that Mother failed to adjust her circumstances, conduct, or conditions to meet the needs of the child. K.S.A. 38-2269(b)(8).

*K.S.A. 38-2269(c)(1)*

The district court found that Q.R. "was not in the physical custody of a parent," and that Mother was unfit because she failed "to assure care of the child in the parental home when able to do so." K.S.A. 38-2269(c)(1). At the time of the termination hearing, Q.R. had not resided with Mother for over a year.

Mother failed to complete critical case plan tasks that could have resulted in Q.R. residing in her home. Mother did not have stable housing or employment, did not appropriately participate in visitation, and did not complete the required psychological

evaluation. Most concerning is that despite intervention, Mother did not understand why she could not leave Q.R. unsupervised.

Instead of continuing to work on case plan tasks in Kansas, Mother went for a visit to Georgia and did not return. By Mother's own testimony, she lived first with a friend, lives currently with her mother, and is searching for an apartment. Mother did not have stable housing in Kansas, and no agency representative has been able to confirm Mother has appropriate housing in Georgia. An ICPC was denied for an aunt, and Q.R.'s maternal grandmother did not qualify because she had no permanent address. The evidence at the termination hearing was that it would be very difficult for reintegration to occur without further agency assistance, and yet Mother moved to Georgia without having assistance in place. While an ICPC with Mother was discussed, it had not occurred by the time of the termination hearing. And even if an ICPC was not actually required for Mother because she is a parent, reintegration was not within reach for Mother in Kansas due to her failure to complete case plan tasks. Reintegration cannot be completed simply because Mother moved to Georgia—Mother would still need to complete her case plan tasks and demonstrate that she has a safe and stable home for Q.R. She did not accomplish this task in a timely manner so that Q.R. could have permanency.

Considered in a light most favorable to the State, clear and convincing evidence supports the district court's decision that Mother was unfit pursuant to K.S.A. 38-2269(c)(1).

*K.S.A. 38-2269(c)(2)*

The district court found that Q.R. was not in Mother's custody, and Mother failed "to maintain regular visitation, contact or communication with the child or with the custodian of the child" pursuant to K.S.A. 38-2269(c)(2). The district court specifically

24

stated that "[M]other chose to leave the state of Kansas in July, and provided no notification to her St. Francis case worker, or even her attorney" that she had done so.

Q.R. was removed from her home in November of 2023. Mother was living with various people and was unwilling to involve them in the case for the purpose of background checks. Since Mother did not have a stable home throughout the case, all visits were either at the SFM office or in the community. Mother had her first visit with Q.R. on December 14, 2023. Mother's visits were scheduled in person with Q.R. until Mother left for Georgia. Mother often cancelled visits or was significantly late. Mother also struggled to focus on Q.R. during visits and instead spent time on her phone.

Once Mother moved to Georgia, Mother and Q.R.'s visits were by Zoom unless Mother was back in Kansas for court. The district court had clear and convincing evidence to find Mother had failed to maintain regular visitation, contact, or communication with Q.R. while she was in out of home placement.

Clear and convincing evidence supports the district court's decision that Mother was unfit pursuant to K.S.A. 38-2269(c)(2).

*K.S.A. 38-2269(c)(3)*

The district court found that Mother failed to carry out a reasonable plan approved by the court directed toward the integration of the child back into Mother's home.

Again, Mother did not complete most of her case plan tasks, and notably failed to complete the critical tasks of housing, employment, visitation, and obtaining a psychological evaluation. Additionally, while Mother completed a mental health intake in the prior CINC case, the evidence was that she did not complete a new intake while in Kansas. Mother may have obtained an intake while in Georgia, but the intake was not

25

part of the record. A crucial case plan task was communication with her case manager and team; yet Mother moved to Georgia without informing her team and without having made arrangements for services to begin in Georgia. For all these reasons, clear and convincing evidence supports the district court's finding that Mother was unfit pursuant to K.S.A. 38-2269(c)(3).

*K.S.A. 38-2269(b)(9)*

Under K.S.A. 38-2269(b)(9), the court shall consider

"whether, as a result of the actions or inactions attributable to the parent and one or more of the factors listed in subsection (c) apply, the child has been in the custody of the secretary and placed with neither parent for 15 of the most recent 22 months beginning 60 days after the date on which a child in the secretary's custody was removed from the child's home."

There is a disagreement between the parties as to the proper calculation of the exact number of months Q.R. was in foster care under this statute. We do not need to resolve this disagreement because we have already found that Mother is unfit under multiple subsections of K.S.A. 38-2269(b) and (c). "Under K.S.A. 38-2269(f), any one factor may—but does not necessarily—establish grounds for termination of parental rights." *In re K.W.D.*, 321 Kan. 100, Syl. ¶ 3, 573 P.3d 221 (2025). Here, multiple statutory factors support the district court's decision to terminate Mother's parental rights. We see no need to consider this additional factor.

*Presumptions of Unfitness*

The district court applied the presumption found at K.S.A. 38-2271(a)(3), which presumes a parent is unfit if "on two or more prior occasions a child in the physical custody of the parent has been adjudicated a child in need of care." The district court

interpreted this subsection to mean the current adjudication and one prior. Mother disagrees.

The district court also applied the presumption found at K.S.A. 38-2271(a)(5), which provides:

> "[T]he child has been in an out-of-home placement, under court order for a cumulative total period of one year or longer and the parent has substantially neglected or willfully refused to carry out a reasonable plan, approved by the court, directed toward reintegration of the child into the parental home."

Mother argues that the district court erred because it failed to address whether it relied upon K.S.A. 60-414(a) or (b) in applying both presumptions. Mother argues that the district court's failure to make a finding under K.S.A. 60-414 violated her right to due process. A panel of our court considered this argument within the case of *In re J.L.*, 20 Kan. App. 2d 665, 891 P.2d 1125, *rev. denied* 257 Kan. 1092 (1995). The panel concluded that the United States Constitution requires a district court to determine whether K.S.A. 60-414(a) or (b) applies prior to applying any presumption found in K.S.A. 38-1585 (Furse 2000) (predecessor statute to K.S.A. 38-2271). 20 Kan. App. 2d at 681.

Mother acknowledges that she is challenging the district court's application of both presumptions for the first time on appeal.

> "Ordinarily, appellate courts do not consider constitutional issues raised for the first time on appeal. But the courts can opt to review newly raised issues where:
>
> "'(1) the newly asserted theory involves only a question of law arising on proved or admitted facts . . . ; (2) consideration of the theory is necessary to serve the ends of justice or to prevent [a] denial of fundamental rights"'; or (3) the district court's judgment

27

is correct for the wrong reason. [Citations omitted.]" *In re A.S.*, 319 Kan. 396, 399, 555 P.3d 732 (2024); see *State v. Arnett*, 314 Kan. 183, 185, 496 P.3d 928 (2021).

These exceptions are "'prudential,'" providing an appellate court discretion over the decision of whether to extend one. *In re A.S.*, 319 Kan. at 399; see *State v. Johnson*, 310 Kan. 909, 912-13, 453 P.3d 281 (2019); *State v. Parry*, 305 Kan. 1189, 1192, 390 P.3d 879 (2017). "'Even if an exception would support a decision to review a new claim, [an appellate court has] no obligation to do so.'" *In re A.S.*, 319 Kan. at 400 (quoting *Arnett*, 314 Kan. at 185).

Mother urges us to apply the second exception to reach the merits of her argument. But even if we were to do so, Mother's claims could not amount to reversible error.

> "We note that the district court's decision terminating mother's parental rights was based on two grounds: application of the statutory presumption, and the determination that mother is unfit under K.S.A. 2008 Supp. 38-2269. If sufficient evidence exists to support the determination based on the statutory factors of unfitness, reversal would not be required." *In re J.S.*, 42 Kan. App. 2d 113, 119, 208 P.3d 802 (2009).

Here, the district court correctly found independent of any presumption that Mother was unfit under multiple subsections of K.S.A. 38-2269(b) and (c). Clear and convincing evidence supports the district court's findings. It is therefore unnecessary to consider whether the district court erred in applying the presumptions of unfitness found at K.S.A. 38-2271(a)(3) and (a)(5).

*Foreseeability*

On appeal, we consider whether clear and convincing evidence supports the district court's finding that the "conduct or condition" that was the basis for Mother's unfitness "is unlikely to change in the foreseeable future." K.S.A. 38-2269(a).

Mother argues that the State did not prove she would be unfit in the foreseeable future. She asserts that the district court's finding was based on evidence from the earlier stages of Mother's case plan. Mother testified that she now knows leaving Q.R. alone is wrong. She asserts Q.R. will be supervised by relatives in Georgia but also acknowledges that living with her mother is temporary, and that she is in the process of getting her own apartment.

While there have been some recent improvements, Mother still lives a significant distance from Kansas and has not arranged to return to Kansas to visit Q.R., except for when she is also taking care of criminal matters. Mother specifically testified that she would not visit Q.R. in Kansas because she was saving money to get her own apartment. Mother has also not shared her plan for reintegrating Q.R. into her home other than asking the court in Kansas to simply release Q.R. to her in Georgia. Mother was not close to achieving reintegration in Kansas. If Mother was still in Kansas, there would be a supervised process toward reintegration that would be monitored. By leaving Kansas, Mother has made reintegration much more difficult.

The foreseeable future must be considered in child-time. *In re R.S.*, 50 Kan. App. 2d 1105, 1117, 336 P.3d 903 (2014). Kansas law "recognizes that children experience the passage of time in a way that makes a month or a year seem considerably longer than it would for an adult, and that different perception typically points toward a prompt, permanent disposition." *In re M.S.*, 56 Kan. App. 2d 1247, 1263, 447 P.3d 994 (2019). In evaluating this time frame, the *In re M.S.* panel stated that a significant factor was the very young age of the children involved. 56 Kan. App. 2d at 1264. Further, a court can look to a parent's past pattern of conduct as one indication of how the parent will conduct themselves in the foreseeable future. *In re M.S.*, 56 Kan. App. 2d at 1264; see also *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982). At the time of the termination hearing, Q.R. had been out of Mother's home for nearly half of her life. Mother had failed to supervise Q.R. on three different occasions resulting in CINC cases and criminal

29

charges. Mother failed to show an understanding of the importance of supervising Q.R. Mother also failed to reintegrate Q.R. back into her home in a timely manner in order to provide Q.R. permanency. Clear and convincing evidence supports the district court's finding that Mother is unfit and that her unfitness is unlikely to change in the foreseeable future.

*Best Interests of the Child*

After making a finding of unfitness of the parent, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 38-2269(g)(1). In making such a decision, the court shall give primary consideration to the physical, mental, and emotional health of the child. K.S.A. 38-2269(g)(1).

The district court's "best interests" determination is reviewed under an abuse of discretion standard. *In re R.S.*, 50 Kan. App. 2d 1105, 1114, 336 P.3d 903 (2014).

> "'A judicial action constitutes an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. The party asserting an abuse of discretion [in this case Mother] bears the burden of showing such an abuse of discretion. [Citations omitted.]" *In re S.R.C.-Q.*, 52 Kan. App. 2d 454, 464, 367 P.3d 1276 (2016).

Here, the evidence before the court was that at the time of the termination hearing, Q.R. was approaching her fourth birthday. Q.R. had spent nearly half of her short life—21 months—in foster care. At the time of the termination hearing, Mother had moved to Georgia, was looking for an apartment, and had only recently started to work again. Mother only had visits with Q.R. by Zoom or when she returned to Kansas to address her criminal charges. Mother had no plan to resume in-person visits with Q.R. because she wanted to save toward getting her own apartment. Mother also had not accomplished

30

many critical case plan tasks including housing, employment, visitation, and obtaining a psychological evaluation.

There was also evidence at the termination hearing as to Q.R.'s well-being. Q.R. was returned to Mother's home in the first CINC case. And at the time Q.R. returned home, she was potty trained and starting to use simple sentences. But when Q.R. was removed from Mother's home again just a few months later, she was no longer potty trained and somewhat non-verbal. She also experienced night terrors. With patience and structure, Q.R.'s foster mother was able to address those behaviors and Q.R. is now on par with her peers. Q.R. also participates in gymnastics, swimming, and Sunday school. Q.R. is thriving in the home of her foster mother.

The district court made no error of law or fact in finding termination of Mother's parental rights was in the best interests of Q.R. And a reasonable person could find that Q.R. needs stability and supervision that Mother is unable to give. The district court did not abuse its discretion in holding that termination was in Q.R.'s best interests.

Affirmed.