IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 125,534

In the Interest of A.S.,
a Minor Child.

SYLLABUS BY THE COURT

1.

If a party appears for a hearing in their own case, then it is presumed the party wants to fully and meaningfully participate in that hearing.

2.

When a party appears for an evidentiary hearing which will address termination of their parental rights, the district court has the duty to ensure that this party has the ability to be meaningfully present in all respects, including the ability to see, hear, speak, and consult with counsel (if they have one) during the proceeding.

3.

A waiver of an appearing party's right to fully and meaningfully participate in a termination of parental rights hearing must be made knowingly, voluntarily, intelligently, and on the record.

Review of the judgment of the Court of Appeals in an unpublished opinion filed June 9, 2023. Appeal from Leavenworth District Court; JOAN M. LOWDON, judge. Oral argument held May 10, 2024. Opinion filed September 6, 2024. Judgment of the Court of Appeals affirming the district court is reversed. Judgment of the district court is reversed, and the case is remanded.

*Chadler E. Colgan*, of Colgan Law Firm, LLC, of Kansas City, argued the cause and was on the briefs for appellant.

*Ashley Hutton*, assistant county attorney, argued the cause, and *Todd Thompson*, county attorney, was with her on the briefs for appellee.

The opinion of the court was delivered by

WILSON, J.: This case involves due process at a hearing for termination of parental rights. H.S. (Father) was in federal custody at the time of the hearing and appeared via Zoom, though the hearing was otherwise in-person. On petition for review, Father argues his limited ability to participate amounted to a due process violation. We agree and reverse the district court and Court of Appeals.

FACTUAL AND PROCEDURAL BACKGROUND

Father and R.A. (Mother) are the biological parents of A.S. While pregnant with A.S., Mother tested positive for amphetamines, and both she and A.S. tested positive for amphetamines again after A.S. was born. Despite the initiation of Family Preservation Services in November 2020, Mother tested positive several more times in the following months.

A.S. went into Department for Children and Families custody in March 2021 and was quickly placed in the care of his paternal aunt. The district court held a permanency hearing around a year later. The court concluded reintegration was no longer a viable plan and permanent custodianship or adoption were in A.S.'s best interests. About a month after the permanency hearing, the State moved for a finding of unfitness and termination of parental rights as to both parents. The district court held a termination hearing on the State's motion on May 11, 2022.

2

Although Father was incarcerated in a federal facility at the time of the termination hearing, he attended the hearing remotely by Zoom. Father spoke to his attorney before the hearing. Counsel clarified Father was in the state but was being held in federal custody. The State's attorneys told the district court they had tried to contact the federal facility where Father was being held, but the facility did not respond to them. The facility did allow for digital access, though whether the access allowed for Father to testify is not apparent in the record before us. When counsel asked "how the [c]ourt would like me to—would the [c]ourt like me to be on Zoom with him or…[?]," the court said:

> "Really, quite frankly, [counsel], this is an in-person proceeding. I'd allowed for the Zoom link so he could at least observe what he can from that vantage point. We're not really set up for bifurcated hearings, but it's also not really possible to bring him back from out of state for this proceeding, so at least he can kind of see and hear what's going on."

Noting the State's unsuccessful efforts to have Father transported from the federal facility, the court then stated it would go forward with the hearing. After the district court said, "[W]e'll be hearing evidence today," it asked if defense counsel was "prepared to proceed." Counsel said, "We are, Judge," and then offered the following opening remarks:

> "[Father] does anticipate being released, at the very latest, this November. He is comfortable with [A.S.] remaining in his current placement for the time being until his release and until he's able to complete his tasks. He did surrender himself voluntarily to go back into custody and address this issue—address his issues in the federal case specifically for the purpose of getting that cleared up so he could work on being with [A.S.] again."

3

Although he cross-examined Kristin McGlinn, the Cornerstones of Care case manager assigned to A.S., defense counsel presented no evidence on Father's behalf. McGlinn's uncontested testimony emphasized that Father's participation in his reintegration tasks was "[n]onexistent. Like, he didn't do anything." The court found Father unfit under K.S.A. 38-2269(b)(3), (b)(4), (b)(7), (b)(8), (c)(2), and (c)(3). The court also held that Father's actions "amount[ed] to neglect as defined by K.S.A. 38-2202(t)." Finally, the court found Father's unfitness was unlikely to change in the foreseeable future and termination of Father's parental rights was in the best interests of A.S. Based on these findings, the court terminated Father's parental rights.

On appeal, Father claimed the district court lacked sufficient evidence to terminate his parental rights. The Court of Appeals panel rejected this claim, holding "that clear and convincing evidence shows that Father was unfit under K.S.A. 38-2269(b)(3), (b)(7), (b)(8), (c)(2), and (c)(3)." *In re A.S.*, No. 125,534, 2023 WL 3914196, at *7 (Kan. App. 2023) (unpublished opinion). The panel found it unnecessary to reach the district court's finding that Father was unfit under K.S.A. 38-2269(b)(4). 2023 WL 3914196, at *7. The panel also affirmed the district court's conclusions that Father's unfitness was unlikely to change in the foreseeable future and that termination of Father's rights was in A.S.'s best interests. 2023 WL 3914196, at *8-9.

For the first time on appeal, Father also claimed the district court violated his due process rights by not allowing him to testify via Zoom at the termination hearing. *In re A.S.*, 2023 WL 3914196, at *9. The panel found that Father's explanation for *why* he failed to raise the issue below "does not comply with [Supreme Court Rule 6.02(a)(5) (2023 Kan. S. Ct. R. at 36),]" and thus declined to reach the issue. 2023 WL 3914196, at *10. But the panel also observed:

"Additionally, Father's failure to raise the claim in district court hampers our ability to review the claim, primarily because there is no indication in the record that Father—as an

4

incarcerated parent—asked or even wanted to testify. Though the district court said it was not set up for bifurcated hearings, this statement falls short of the district court denying any request Father could have made. There is only a brief discussion concerning the efforts the State made to secure Father's physical presence at the hearing, and there is no discussion concerning the State's ability to procure a witness from a federal facility." *In re A.S.*, 2023 WL 3914196, at *10.

The panel thus declined to reach the merits of Father's due process claim. Father petitioned this court for review, and we granted review as to Father's due process claim.

ANALYSIS

Father argues his due process rights at the May 2022 termination hearing were violated because, by only allowing Father to observe the proceedings over Zoom, the district court denied Father the ability to testify or otherwise meaningfully participate in the hearing.

*Standard of Review*

Appellate courts apply an unlimited standard of review in assessing whether an individual's due process rights were violated under specific circumstances, which poses a question of law. *In re Care and Treatment of Quillen*, 312 Kan. 841, 849, 481 P.3d 791 (2021).

*Preservation*

Ordinarily, appellate courts do not consider constitutional issues raised for the first time on appeal. See, e.g., *State v. Arnett*, 314 Kan. 183, 185, 496 P.3d 928 (2021); *State*

5

*v. Parry*, 305 Kan. 1189, 1192, 390 P.3d 879 (2017). But the courts can opt to review newly raised issues where:

> "'(1) the newly asserted theory involves only a question of law arising on proved or admitted facts . . . ; (2) consideration of the theory is necessary to serve the ends of justice or to prevent [a] denial of fundamental rights'; or (3) the district court's judgment is correct for the wrong reason." *Arnett*, 314 Kan. at 185.

Because these exceptions are "prudential," an appellate court has discretion over the decision of whether to extend one. *State v. Johnson*, 310 Kan. 909, 912-13, 453 P.3d 281 (2019); *Parry*, 305 Kan. at 1192. "Even if an exception would support a decision to review a new claim, [an appellate court has] no obligation to do so.'" *Arnett*, 314 Kan. at 185 (quoting *State v. Gray*, 311 Kan. 164, 170, 459 P.3d 165 [2020]).

If the initial reviewing court is a panel of the Court of Appeals, we then review the panel's decision to review or not review the issue for an abuse of discretion. *State v. Genson*, 316 Kan. 130, 135-36, 513 P.3d 1192 (2022).

> "'A court abuses its discretion when its action is (1) arbitrary, fanciful, or unreasonable, i.e., if no reasonable person would have taken the view adopted by the court; (2) based on an error of law, i.e., if the discretion is guided by an erroneous legal conclusion; or (3) based on an error of fact, i.e., if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. The party arguing an abuse of discretion bears the burden of establishing that abuse.'" *State v. Aguirre*, 313 Kan. 189, 195, 485 P.3d 576 (2021) (quoting *State v. Corbin*, 311 Kan. 385, 390, 461 P.3d 38 [2020]).

Father bears the burden of showing the panel abused its discretion. Cf. *State v. Ochoa-Lara*, 312 Kan. 446, 449, 476 P.3d 791 (2020). We find that burden has been

6

satisfied here, because, under the facts presented, no reasonable judge would agree with the panel's decision to deny discretionary review of Father's due process claim.

The panel correctly observed:

- Father did not object at the termination hearing that he could not testify;
- the record fails to say whether Father wanted to testify; and
- Father's counsel did not object to proceeding with the hearing.

But, as we will further outline below, a reasonable interpretation of the court's comments is that the court *had already ruled* the hearing would proceed despite the limitations on Father's ability to participate, effectively preempting objection or a motion to continue the hearing until Father could participate fully. Thus, we are unpersuaded by the panel's conclusion that it could not review the claim "because there is no indication in the record that Father—as an incarcerated parent—asked or even wanted to testify." *In re A.S.*, 2023 WL 3914196, at *10.

Although Father does not highlight it, the panel also made a legal error in applying the final sentence of Rule 6.02(a)(5): "If the issue was not raised below, there must be an explanation why the issue is properly before the court." (2024 Kan. S. Ct. R. at 36). As the panel wrote:

> "An appellant is required to explain why an issue that was not raised below should be considered for the first time on appeal. To comply with Rule 6.02(a)(5), Father asserts 'that the issue of his in person appearance was well known and had been raised in the trial [c]ourt as evidenced by the extensive discussion on the record of Father's custody status and appearance.'
>
> . . . .

"At no point did Father file any motions concerning his physical presence at the hearing prior to its occurrence. Father's counsel also never objected to the hearing proceeding without Father's physical presence. Nor did Father's counsel request a continuance so that Father could be released from federal prison before the termination hearing proceeded. As explained above, Father's counsel essentially did the opposite. Given this context, Father's explanation regarding why the issue was not raised in district court does not comply with Rule 6.02(a)(5).

"Our Supreme Court has warned that Rule 6.02(a)(5) would be strictly enforced, and litigants who failed to comply with this rule risked a ruling that the issue is improperly briefed and will be deemed waived or abandoned. As such, we decline to reach the issue because Father has not complied with Rule 6.02(a)(5). [Citations omitted.]" *In re A.S.*, 2023 WL 3914196, at *9-10.

But the panel incorrectly treated the final line of Rule 6.02(a)(5) as if it required Father to show the issue was *preserved*, not merely to show why it was "properly before the court." While "Rule 6.02(a)(5) means what it says," the burden it imposes is not so high. E.g., *Ellie v. State*, 312 Kan. 835, 839-40, 481 P.3d 1208 (2021) (issue unpreserved under Rule 6.02[a][5] when, among other things, "the State fails to argue—either in its briefs to the Court of Appeals or in filings submitted to this court—any reason for an appellate court to consider the issue for the first time on appeal"); *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015). Here, Father did not simply lay out the merits of his claim. His brief before the panel argued a prudential exception was met because "'consideration of the theory [was] necessary to serve the ends of justice or to prevent the denial of fundamental rights.'" Father also argued his parental rights were a fundamental liberty interest. Father therefore met the requirements of Rule 6.02(a)(5) by invoking the fundamental rights exception. The rule does not require an appellant to explain the issue was preserved, but rather why an unpreserved issue should be considered. While the panel noted Father was claiming a fundamental liberty interest, it committed an error of

8

law by failing to consider that claim in the context of Rule 6.02(a)(5). Accordingly, the panel's conclusion that Father violated Rule 6.02(a)(5) was an abuse of discretion.

We turn to the merits of Father's claim.

*Analysis*

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *In re J.D.C.*, 284 Kan. 155, 166, 159 P.3d 974 (2007). When considering "a procedural due process claim, we must first determine whether a protected liberty or property interest is involved. If it is, then we must determine the nature and extent of the process due." 284 Kan. at 166.

"'[D]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. Due process is flexible and calls for such procedural protections as the particular situation demands.' [Citation omitted.]" *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). "Accordingly, resolution of the issue whether the . . . procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected." 424 U.S. at 334. We have applied the three factors from *Mathews* when determining whether a procedural due process violation has occurred in cases involving parental rights. See *In re A.A.-F.*, 310 Kan. 125, 145-49, 444 P.3d 938 (2019); *In re K.E.*, 294 Kan. 17, 21-26, 272 P.3d 28 (2012); *In re J.D.C.*, 284 Kan. at 166-70. The *Mathews* factors are:

> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative

burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

Our analysis follows this pattern. So we first identify the right asserted and determine whether that asserted right is entitled to due process protections. It is axiomatic that "[a] parent's right to make decisions regarding the care, custody, and control of his or her child is a fundamental liberty interest protected by the Fourteenth Amendment." *In re J.D.C.*, 284 Kan. at 166. Thus we know the asserted right here is a private right entitled to due process protections. But what does that mean in this context?

To answer this question, we turn to the *Mathews* factors to consider the private interest at stake, the risk of depriving that interest against the value of providing additional procedural safeguards, and governmental interests that include practical and fiscal concerns.

*Factor 1: The Interest at Stake*

Under *Mathews*, we must first consider "the private interest that will be affected by the official action." *Mathews*, 424 U.S. at 335. Why? Because important, consequential, fundamental rights are afforded greater due process protections than less important ones. As we noted above, "[a] parent's right to make decisions regarding the care, custody, and control of his or her child is a *fundamental* liberty interest protected by the Fourteenth Amendment." (Emphasis added.) *In re J.D.C.*, 284 Kan. at 166. The United States Supreme Court has explained "[t]he liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000); see also *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *Lassiter v. Dept. of Social Services of Durham County, N.C.,* 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed. 2d 640

(1981) ("A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore a commanding one."); *In re Adoption of A.A.T.*, 287 Kan. 590, 600-01, 196 P.3d 1180 (2008). Because of the importance of this right, this factor weighs in Father's favor.

*Factor 2: Risk of Deprivation and Value of Additional Procedural Safeguards*

The second *Mathews* factor is "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Mathews*, 424 U.S. at 335. Father argues this factor weighs in his favor because he could not testify about his likely release date and prior reunification efforts. Father also claims he was unable to assist counsel with cross-examination.

Recently, the Supreme Court of Iowa explained the importance of a parent's participation at a termination of parental rights hearing:

> "Instead, we adopt the standard that juvenile courts in this state must give incarcerated parents the opportunity to participate from the prison facility in the entire termination hearing by telephone or other similar means of communication that enables the parent to hear the testimony and arguments at the hearing. The interests of the parent, the child, and the state support this opportunity. In particular, it serves the compelling interest of the parent to hear the evidence offered in support of a termination petition and to respond effectively to the evidence. We agree with the observations by other courts that parents normally have unique and exclusive knowledge of evidence concerning the termination. After all, their conduct is at issue. The risk of error is too great if a parent does not have the opportunity to hear this evidence and to formulate a response to it." *In re M.D.*, 921 N.W.2d 229, 236 (Iowa 2018).

The Iowa analysis mirrors our Court of Appeals panel's discussion in *In re Adoption of B.J.M.,* 42 Kan. App. 2d 77, 209 P.3d 200 (2009). In *B.J.M.*, a father argued

11

he was denied procedural due process when the district court prohibited him from being present at the adoption hearing of his child. The father was incarcerated at Hutchinson Correctional Facility, and the adoption was without his consent. The trial court also prohibited the father's counsel from submitting an affidavit in place of the father's testimony. The district court ultimately terminated his parental rights. On appeal, the panel applied the *Mathews* factors and concluded the father was not afforded procedural due process. 42 Kan. App. 2d at 86-87. After noting the interest at stake was the father's fundamental right to parent, the *B.J.M.* panel turned to the second *Mathews* factor:

> "To that end, we find great risk that Father was unlawfully deprived of a fundamental liberty interest when prohibited from personally attending the adoption hearing, especially given the complete absence of any substitute measures to ensure that Father had an opportunity to be heard at a meaningful time and in a meaningful manner. As a preliminary matter, Father was wholly deprived of the opportunity to testify—whether in person, by deposition, or by affidavit—regarding the efforts he made to assume his parental duties in the 2 years preceding the filing of Stepfather's adoption petition, as well as the actions taken by Mother and Stepfather to obstruct these efforts.

> "Moreover, Father was deprived of the opportunity to review, and subsequently challenge, the testimony of and the evidence introduced by Stepfather and Mother at the hearing. This is extraordinarily significant because, although Father's counsel had the procedural ability to cross-examine witnesses and challenge evidence on behalf of Father, Father's inability to assist counsel with regard to these matters greatly diminished the efficacy of his counsel's cross-examination. Given his personal history with Mother, Father was familiar with Mother's traits, propensities, and demeanor, which would assist counsel in cross-examination as to Mother's recollection, veracity, and communication skills. Simply put, we find great risk that Father was unlawfully deprived of a fundamental liberty interest when prohibited from personally attending the adoption hearing. As such, this second factor also weighs in favor of a finding that Father's due process rights were violated in failing to transport him to the adoption hearing." 42 Kan. App. 2d at 85-86.

12

Here, Father was unable to participate in any meaningful way. Because of the procedures used at the May 2022 hearing, Father could not testify, interact with counsel, or otherwise respond to the State's case. See *In re M.D.*, 921 N.W.2d at 235 ("Parents often have exclusive and particular knowledge of the evidence offered by the [S]tate to support the termination petition and need to hear it to understand the evidence needed to make an effective response."). In essence, Father was a member of the gallery—able to see and hear but unable to influence the outcome of the State's attempt to terminate his parental rights. The risk to Father's parental rights is relatively great under such limitations. Likewise, a short continuance for a later hearing, whether digital, hybrid, or in-person, allowing Father the ability to see, hear, and speak during the hearing, while giving him the ability to consult with counsel, would have been extremely valuable in providing procedural safeguards. This factor weighs in Father's favor.

*Factor 3:  State Interests*

Finally, courts must consider the "Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. In *Santosky*, the United States Supreme Court explained:  "[T]wo state interests are at stake in parental rights termination proceedings—a parens patriae interest in preserving and promoting the welfare of the child and a fiscal and administrative interest in reducing the cost and burden of such proceedings." *Santosky*, 455 U.S. at 766. Additionally, both A.S. and the State have an interest in promptly resolving the case. *In re M.S.*, 56 Kan. App. 2d 1247, 1253, 447 P.3d 994 (2019).

We conclude that none of these State interests justify Father's inability to meaningfully participate at the May 2022 hearing.

13

First, promoting the welfare of the child suggests the child should receive the proper placement. Father's testimony and discussion with counsel would have increased the probability of appropriate placement because these procedural safeguards may have allowed additional relevant facts to be considered by the district court. See *Stanley v. Illinois*, 405 U.S. 645, 657-58, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972) ("The State's interest in caring for Stanley's children is *de minimis* if Stanley is shown to be a fit father.").

Second, as Father notes, any administrative or fiscal costs and burdens would have been minimal. Often these cases involve the court considering the administrative and fiscal burdens of transporting an incarcerated parent to the hearing. See, e.g., *In re Adoption of B.J.M.*, 42 Kan. App. 2d at 86 ("Regarding the expense to the government of transporting Father and providing for his safekeeping, there is no evidence in the record of cost to the government that compliance with Father's request would have entailed. Nevertheless, common sense suggests that the burden on the State would not have been prohibitive."). But here, Father was already available and virtually present. Presumably, any burdens such as hooking up speakers or a microphone, asking the court reporter to create a transcript of Father's testimony, and providing Father opportunities to consult with his attorney would be substantially less burdensome than a prisoner transport—particularly since the hearing occurred in 2022, two years after the COVID-19 pandemic first necessitated the use of virtual court hearings. Thus the court would have had some familiarity with video conference platforms. Alternatively, if a hybrid virtual and in-person hearing was not practical, then any administrative or fiscal costs and burdens associated with continuing the hearing and holding it entirely by videoconference were similarly minimal, particularly when weighed against a potentially unjustified termination of parental rights.

14

Third, the State's interest of a timely resolution would likely not have been impacted here because the court issued its order terminating Father's parental rights around a month after the hearing. The record does not reflect that allowing Father to testify and consult counsel would have significantly delayed the court's order. See *In re S.D.*, No. 116,185, 2017 WL 2001662, at *7 (Kan. App. 2017) (unpublished opinion) ("The only procedural request in this case was simply to allow Mother to testify on the third day of trial. This procedure would not have added a single day to the trial if the court had not closed the evidence. One day is not too large a burden, even if it is considered in 'child time.'"). And even if the court needed to bifurcate the hearing to allow for the setup of any audiovisual equipment needed to facilitate Father's participation, the record reflects nothing to suggest this would have been difficult. By May 2022, entire hearings by videoconference were common. Any resulting delay need not have been long. Besides, such a delay would be warranted to protect Father's right to be meaningfully heard, given the importance of the right at stake. *Stanley,* 405 U.S. at 656 (Due Process Clause was "designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones."); *In re M.D.*, 921 N.W.2d at 236. This factor also weighs in Father's favor.

After considering the facts here and the *Mathews* factors, we conclude due process required Father to be able to testify, communicate with counsel, and otherwise fully participate in the termination of parental rights hearing.

*Father was denied due process.*

Still, the question remains whether Father was *denied* those due process rights, or if instead he waived them through inaction, failure to object, or acceptance of the process provided him. See *In re A.A.-F.*, 310 Kan. at 145 ("To establish a due process violation,

[a parent] must show [they] were both entitled to and denied a specific procedural protection."). The panel suggested "there is no indication in the record that Father—as an incarcerated parent—asked or even wanted to testify. Though the district court said it was not set up for bifurcated hearings, this statement falls short of the district court denying any request Father could have made." *In re A.S.*, 2023 WL 3914196, at *10.

This characterization overlooks the context of the district court's remarks, however. Before any evidence was admitted, Father's counsel explained to the court that Father was in federal custody. The State observed it had attempted to contact the federal facility with no success. However, there was no discussion of whether other, more formal procedures would have been successful or even if they had been attempted within a reasonable time before the hearing. When Father's counsel asked "how the Court would like me to—would the Court like me to be on Zoom with him or. . . [?]" The court responded:

> "Really, quite frankly, [defense counsel], this is an in-person proceeding. I'd allowed for the Zoom link so he could at least observe what he can from that vantage point. We're not really set up for bifurcated hearings, but it's also not really possible to bring him back from out of state for this proceeding, so at least he can kind of see and hear what's going on."

This statement implies that Father could *only* see and hear the proceeding. In effect, a reasonable interpretation is the court implicitly ruled Father could not meaningfully *participate* in the evidentiary hearing and the hearing would proceed, regardless.

The panel found significant that Father's counsel failed either to object or inform the district court Father *wanted* to testify. But when a party shows up for a hearing, we do not place a muzzle on him just in case he does not object to his inability to speak. If a

16

party appears for a hearing in his own case, we *presume* he wants to fully and meaningfully participate in that hearing *because he is entitled to do so*. When a party appears for an evidentiary hearing that addresses termination of his parental rights, the district court has the duty to ensure the party has the ability to be meaningfully present in all respects, including the ability to see, hear, speak, and consult with counsel (if they have one) during the proceeding. The duty is no less where, as here, an incarcerated party appears virtually. Cf. *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 378, 99 S. Ct. 2898, 61 L. Ed. 2d 608 (1979) ("To safeguard the due process rights of the accused, a trial judge has an affirmative constitutional duty to minimize the effects of prejudicial pretrial publicity."). This concept is not new, even though technology has far surpassed what an "appearance" once entailed before virtual hearings became common. Cf. *Fischer v. State*, 296 Kan. 808, Syl. ¶ 7, 295 P.3d 560 (2013) (in the context of a civil habeas proceeding):

"An important consideration in using any alternative to a prisoner's physical presence in the courtroom for an evidentiary hearing . . . must be whether the court can give fair consideration to the particular claims in dispute, as well as the prisoner's ability to meaningfully participate in the proceedings. This includes the capability to consult privately with counsel."

Here, the issue is whether Father's due process rights were sufficiently accommodated given the manner of appearance the court allowed. And the answer must be "no." At a minimum, there was no discussion or accommodation for Father to testify or communicate with his counsel during this critical hearing.

Of course, a parent who has appeared as a party in a termination hearing may decline to exercise his right to fully participate, or even forfeit some of this right if he is disruptive. See *D. H. Overmyer Co. Inc., of Ohio v. Frick Co.*, 405 U.S. 174, 185, 92 S. Ct. 775, 31 L. Ed. 2d 124 (1972) ("The due process rights to notice and hearing prior to a civil judgment are subject to waiver."); *Illinois v. Allen*, 397 U.S. 337, 343, 90 S. Ct.

17

1057, 25 L. Ed. 2d 353 (1970) ("The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated. We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case."). But because his very appearance conveys he is there to exercise his right to fully participate, such a waiver is not presumed. We today clarify that a waiver of an *appearing* party's right to fully and meaningfully participate in a termination of parental rights hearing must be made knowingly, voluntarily, intelligently, and *on the record*.

Based on the record before us, we hold Father was denied due process at the May 2022 termination hearing.

*This error is not harmless.*

The final question is how to evaluate such an error. Father asks us to automatically reverse because this error is structural. But we need not decide whether this type of error is structural (as some panels of the Court of Appeals have held) because in any event the error was not harmless. Cf. *In re Adoption of B.J.M.,* 42 Kan. App. 2d at 87-88. Under our constitutional harmlessness test:

> "'[T]he error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict.'" *State v. Sherman*, 305 Kan. 88, 100, 378 P.3d 1060 (2016) (quoting *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011]).

Under this test, the State must show beyond a reasonable doubt the outcome of the termination hearing would be the same had Father been able to testify and otherwise

18

meaningfully participate at the hearing. See *State v. Herbel*, 296 Kan. 1101, 1110, 299 P.3d 292 (2013). But the State cannot satisfy this burden here. The case against Father was almost entirely based on his failure to participate in the reintegration process. Perhaps Father's testimony would not refute that he had failed to satisfy the technical requirements of his reintegration plan, i.e., had failed to communicate with Cornerstones of Care or submit proof of completion of courses, etc. But Father was unable to testify about his relationship with Cornerstones of Care or about any potential barriers that may have affected his ability to complete his reintegration tasks, which might have been germane to the district court's ultimate findings of unfitness. We just do not know what he would have said if he had been able to say it. So we cannot say beyond a reasonable doubt Father's parental rights would have been terminated if he had been given the ability to meaningfully participate at the May 2022 termination hearing.

We therefore reverse the Court of Appeals and district court and remand the case to the district court to complete a new termination of parental rights hearing which satisfies Father's due process right to meaningfully participate.

Judgment of the Court of Appeals affirming the district court is reversed. Judgment of the district court is reversed, and the case is remanded.