NOT DESIGNATED FOR PUBLICATION

No. 128,647

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of J.N.N. and J.P.N.,
Minor Children.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; MICHAEL HOELSCHER, judge. Submitted without oral argument. Opinion filed February 6, 2026. Affirmed.

*Laura E. Poschen*, of Poschen Law, LLC, of Wichita, for appellant natural mother.

*Kristi D. Allen*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before SCHROEDER, P.J., MALONE and GARDNER, JJ.

PER CURIAM: Mother appeals the district court's order terminating her parental rights to J.N.N. and J.P.N., minor children. Mother claims the district court's findings of her present and future unfitness are not supported by clear and convincing evidence. She also claims the termination of her parental rights is not in the best interests of the children. After thoroughly reviewing the record, we affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Mother has three children including J.N.N. and J.P.N., minor children who are the subject of this case. The third and oldest child lives with her paternal grandmother and has no part in this case. This opinion will use the term "children" as including only J.N.N. and J.P.N. When J.N.N., the middle child, was 22 months old, Mother had her live with her maternal grandmother (Grandmother). When J.P.N. was born, Mother also sent her to

1

live with Grandmother as soon as she was able to leave the hospital. Mother lived with Grandmother and the two children sporadically between Mother's work trips as an 18-wheeler truck driver. Father was not regularly involved with J.N.N.'s and J.P.N.'s lives.

On November 20, 2020, when J.N.N. was seven years old and J.P.N. was two, Grandmother called the Department for Children and Families (DCF) for assistance with the children because J.N.N. was exhibiting severe behavioral problems including hours-long fits that included actions like J.N.N. trying to stab Grandmother or choke J.P.N. After multiple social worker visits, it was determined that the State would move to find the children in need of care and take them into protective custody because Grandmother was unable to care for the children due to her failing health and because Mother was unable to be consistently present due to her work schedule causing her to leave for long periods of time. The district court held a temporary custody hearing on February 17, 2021, where Mother stipulated to the State's proffer. The children were placed into the temporary custody of DCF for out-of-home placement.

The district court held an adjudication/dispositional hearing on April 21, 2021, where Mother entered a statement of no contest, and the district court found the children in need of care and adopted the proposed permanency plan. In a Saint Francis Ministries court report filed June 28, 2021, Mother's plan objectives at the time were listed as: (1) maintaining contact with the case team, (2) completing a parenting assessment and following recommendations, (3) completing a mental health evaluation and following recommendations, (4) completing a parent psychological evaluation and following recommendations, (5) completing an age appropriate parenting class and following recommendations, (6) attending all scheduled visitation, and (7) maintaining stable employment allowing her to be the primary caretaker of the children. A psychological evaluation report was filed into the record on June 29, 2021. The report summarized:

"[Mother] presents the clinical picture of a remarkably immature person who has struggled all her life. She has recently been able to function in work settings, but she has struggled 'on the inside' all her life with self-doubt, anxiety, and depression. She has recently been able to succeed as a truck driver, since she is essentially in control of her work and she is essentially alone . . . . It is doubtful that she would be able to maintain traditional employment that placed her in continual contact with co-workers or with the public.

"[Mother] has apparently been only marginally involved in her daughters' lives. [Mother] might succeed, with significant support and guidance, with a typical child who would be very responsive and very rewarding for [Mother's] efforts. It is highly questionable if [Mother] would be able to manage [J.N.N.] on her own.

"[Mother] described how she cannot keep the employment she currently has and then take custody of her children. Her current work hours are so inconsistent that she cannot predict if she would be home sufficient hours to both put the children to bed and then get them up and ready for school in the morning. She would need a caretaker who could live in, drop in with very short notice, or who could readily move the children to the caretaker's home from time to time. [Mother] would need to find financial support without employment or would need to find employment that was fixed with daytime hours.

"Unfortunately, [Mother's] chronic anxiety, depression, and interpersonal issue may make it difficult for her to find typical or competitive employment that she could tolerate.

"At the end of the interview and testing sessions, [Mother] was asked about her ideal lifestyle. She stated emphatically, 'On the road . . . it is so peaceful . . . and I just love it!'

"As a prerequisite to gaining custody of her children, [Mother] will need to establish that she can adequately care for herself first. It was reported that her own mother, [Grandmother], will be moving away to care for her own sister, who is seriously ill. [Mother] will need to learn to live on her own without her mother there to rescue her again."

The report concluded with recommendations that Mother "will need a great deal of guidance and support to function as a parent" and that she "should seek out a

psychotherapist that is thoroughly familiar with children with chronic and severe developmental issues. She should remain in treatment until discharged by the therapist. Reports to the court should include attendance and cooperation/progress comments without session content of personal data."

Mother's case team reported in an April 2021 update that Mother had stated she was never going to get her children back because she could not "do this without [Grandmother]." In an update dated June 30, 2021, it was reported that Mother found new employment, but that job still required Mother to work long hours so Grandmother would still be the primary caretaker of the children upon reintegration. The case team reported its concern that it had not seen enough change that would prevent the children from returning to DCF custody if reintegrated with Mother. Mother attended her visitations and felt they were going well. In an update dated March 2, 2022, it was reported that the children would be reintegrated with Grandmother, who would take care of the children during the week, and Mother would care for the children over the weekends.

A parent-child assessment dated September 6, 2022, found that Mother exhibited a "very high degree of parental stress" and that she had "few strategies for emotional regulation and problem-solving." The assessment concluded with recommendations that Mother "not be identified as a full-time caregiver for the children until she is able to effectively utilize the parenting skills that she has received training on." The assessment also concluded that Mother would benefit from individual therapy and needed to be consistently engaged with individual therapy.

On October 6, 2022, the case was transferred to Sedgwick County from Geary County after Grandmother and Mother moved to Wichita. The new case team reported to the district court that after the children reintegrated with Grandmother, Grandmother once again called DCF because she could not manage J.N.N.'s behaviors, so J.N.N. was placed back with the same foster placement as before reintegration. J.N.N. was reportedly doing

4

well in that placement and the placement had not reported any behaviors that they could not manage. J.P.N. remained with Grandmother.

Mother had unsupervised visitation with the children during the weekends. The new case team reported the reintegration plan as including a term that "[p]arents shall sign all necessary releases of information for all court ordered assessments, evaluations, tests, and treatment programs and parties shall follow all recommendations from the above-ordered assessments, evaluations, tests, and treatment programs." The new case team reported that the transferring case team recommended to them that Grandmother work towards adopting J.P.N. and that J.N.N. "transfer to adoption."

A report prepared on March 30, 2023, stated that Grandmother "has had health issues and is worried that she may possibly not be able to care for [J.P.N.] long-term." The report also noted that the parent-child assessment and psychological evaluation resulted in a recommendation that Mother attend individual therapy, which the previous case team had reported having difficulty "to get [Mother] to engage in mental health services as she often used her work schedule as an excuse for her lack of availability." Despite discussing the need for individual therapy with Mother, the case team reported that she "has shown very little initiative in following through." The report concluded:

> "[Mother] feels content with the current arrangement of being allowed to visit with [J.N.N.] but not involving herself in [J.N.N.'s] day-to-day care and instead, allowing placement to be responsible for this. This is based on [Mother's] complete lack of initiative in gathering any information for [J.N.N.'s] many medical and mental health appointments despite being prodded to do so, and also her complete lack of effort in seeking out ways to help manage [J.N.N.] beyond relying on [Grandmother] when she is frustrated. [Mother] is able to identify when she is frustrated and can no longer handle the girls which is a positive attribute, however, her lack of patience and initiative makes returning t[w]o girls to her care at this time, a huge concern. [Mother] has also failed to address her own mental health concerns, as she has been recommended individual

therapy to address her emotional regulation and executive functioning and has not made any steps in engaging in this."

In a court report dated April 7, 2023, Mother's case team reported concern that Mother was unable to parent the children without Grandmother's help and had made "minimal to no progress on court orders." The case team recommended that the district court find reintegration no longer viable and noted that the State would file a motion to terminate Mother's parental rights. On May 10, 2023, the State moved to find Mother unfit to parent the children and to terminate her parental rights to the children. The district court found reintegration no longer viable on the same day.

*The termination hearing*

The district court held a termination hearing that began on August 10, 2023. Father did not appear at the hearing, and the district court terminated his parental rights. The State's first witness against Mother was Randee Olive, a psychotherapist who conducted play therapy with J.N.N. Olive described J.N.N.'s meltdowns and the extra care she needed but otherwise provided little evidence pertinent to the hearing.

The State next called Mother. Mother described her job driving trucks between Wichita and Kansas City, which took around eight hours per day. Mother later explained "it could be anywhere from 10 to 14 hours" because she often had to deliver an extra load. Despite getting a new job, Mother's time with the children did not increase because her case team did not want her taking the children to work with her.

Mother acknowledged she was court-ordered to get a psychological evaluation, which she completed. When asked what other orders she was given, Mother stated, "They wanted me to seek therapy." Mother claimed she attended individual telehealth therapy sessions during the early part of this case, but the therapist eventually wanted her to

physically come into the office and began scheduling her at difficult times due to her work schedule. Mother stopped attending those sessions then.

Mother also acknowledged that her current caseworker, Kayti McWilliams, had discussed with her the need to attend therapy and the concern about reintegrating the children until that happened. Mother attended all of J.P.N.'s appointments but did not attend all of J.N.N.'s because she could not always get a ride to the appointments.

When the children were both temporarily reintegrated with Grandmother, Mother's work schedule was still "all over the place" and Grandmother could not handle J.N.N.'s "extreme mood swings and meltdowns." During the children's weekend visitations with Mother, she claimed no behavioral issues arose with either child that she could not handle. Grandmother would periodically come over for dinner "or something like that." Mother reported she would call Grandmother if any problems arose, but Mother had not had any such problems. McWilliams gave Mother the number to a support group for parents with children who have behaviors like J.N.N.'s, but Mother was unable to contact the group. Mother tried looking up other options for support, but all she found were therapists and that was "not what [she was] looking for."

Mother started attending remote therapy sessions again in May 2023 and at the time of the termination hearing had last attended in mid-July 2023. The sessions had not yet progressed to a point to where Mother received recommendations or resources that could help her. Mother claimed her only concern about parenting the children was J.N.N.'s outbursts but that she had been "almost a dream child and not so hard" since starting her new medication. Mother's care team occasionally allowed Mother additional visitation time with the children, but she did not exercise that time because of her work schedule. Mother's plan for reintegration was that Grandmother would care for the children every day after school, but she acknowledged that summers without school posed a problem. Mother claimed she tried to be home from work by 5 p.m. At the end of

7

Mother's direct examination, her counsel waived cross-examination while reserving the right to call Mother during her case-in-chief.

The State next called Meredith Whaley, a clinical supervisor with Saint Francis Ministries. Whaley administered a parent-child assessment on Mother and the children. Whaley's report was admitted into evidence. Mother scored in the high-risk categories in a strong belief in corporal punishment and restricting the children's power and independence. Mother also scored as having "a clinical level of distress or stress in all domains." Whaley explained that a clinical level is a level where clinical intervention is recommended and that those scores could reflect that Mother was not finding pleasure in her interactions with the children. An example of the kind of clinical intervention recommended was working with an individual or family therapist.

Whaley also observed Mother with each child individually as Mother carried out preset activities with the children written on cards that Whaley had given to Mother. The activities on the cards were designed to highlight various areas for assessment like nurturing, structure, engagement, and challenges. Whaley reported some concerns with Mother's approach to some of the activities; for example, when Mother was instructed to temporarily leave the room without the children, she did little to prepare them for her temporary absence. Mother also "struggled in remaining the authority figure in the session, as she was not always presenting directives clearly."

Mother was far less engaged with J.N.N. during the assessment and did not respond to J.N.N. as quickly as she had with J.P.N. At one point J.N.N. told Mother she loved her, but Mother "failed to respond to that." Whaley also concluded that Mother tended to invalidate the children's emotional responses, which could increase conflict and confuse the children. Mother missed opportunities to be more complementary and encouraging to the children. During the assessment Mother commented to Whaley that she was unable to handle J.N.N. most of the time. Whaley recommended that Mother not

be identified as the full-time caregiver to the children until she could effectively use the parenting skills she had received in training. Whaley recommended Mother be engaged in therapy. Whaley's final prognosis for Mother was "guarded." Whaley stated that she needed to see changes such as Mother having the ability to plan for herself and the children. Whaley sensed there was no plan for how Mother would "do this" full-time.

McWilliams, a permanency specialist for reintegration, testified next. McWilliams was the current case specialist after the case was transferred to Sedgwick County in October 2022. At the time of the transfer, the remaining court orders that Mother had to fulfill were attending the children's appointments, learning more about J.N.N.'s care, being engaged in J.N.N.'s care, and attending individual therapy. It took Mother "a while" to get engaged with individual therapy, which Mother attributed to her work schedule. Mother missed many of J.N.N.'s appointments, and when McWilliams recommended she coordinate with J.N.N.'s placement, it took Mother a while to take initiative to reach out and Mother began doing so only recently before the termination hearing.

Since restarting individual therapy in May 2023, Mother attended four sessions before the termination hearing. McWilliams requested a report from the therapist but was told the therapist was not ready to provide one because she had not been seeing Mother long enough. McWilliams provided Mother with resources to find a suitable therapist and a support group for parents with children who have high behaviors.

Many of Mother's weekend visits involved Grandmother, but Mother took the children out to activities like swimming, shopping, and out to eat. Mother asked for additional visitation time, and McWilliams granted it, but Mother was unable to use her additional time because she could not take J.N.N. to an appointment that she would have been responsible for during that additional time. McWilliams recalled one time she visited J.P.N. at Grandmother's home during a time when Mother was supposed to have J.N.N., but J.N.N. was also unexpectedly with Grandmother because Mother had to work.

Mother had reported no major concerns with visitations, which McWilliams attributed to Grandmother's assistance. Mother admitted to being overwhelmed at times, such as during bedtimes, so she would ask Grandmother for assistance or that "a lot of times" the children would end up at Grandmother's house because Mother got overwhelmed. McWilliams did not think Mother was always the primary caregiver for the children during her weekend visitation. That did not concern McWilliams for short term visits, but long-term McWilliams was concerned because Grandmother had been struggling with her health and there had been a history of Mother placing the responsibility of the children onto Grandmother. Grandmother had also struggled with providing full-time care for the children and had requested shorter visits.

J.N.N.'s behavior had been improving leading up to the termination hearing, which McWilliams attributed to a change in therapist, medication, and to her placement, who provided her structure and stability. McWilliams recommended to Mother that she talk to J.N.N.'s placement to learn more about how they interact with J.N.N. and de-escalate her outbursts, but Mother did not do so. Mother "consistently state[d] that she cannot handle [J.N.N.] on her own" and that it was difficult to handle the children when they were defiant. Mother only switched gears when the district court found reintegration no longer viable, and McWilliams then started to hear Mother say that she was ready to handle both children. McWilliams was concerned that Mother was minimizing J.N.N.'s needs because even when J.N.N. was stable there were situations that needed to be de-escalated.

Mother and Grandmother had discussed living together again and co-raising the children, but McWilliams did not think that was a viable solution because it was unsuccessful before. McWilliams described that Mother had so far failed to show secondary changes. McWilliams explained that to her a secondary change was the ability to maintain what Mother had learned from completing her court orders and case plan tasks. Mother had not shown the necessary secondary change for reintegration to occur because she still struggled with her parenting skills and made little leeway in learning

about that deficiency. Mother's lack of knowledge about J.N.N.'s mental health and her providers also concerned McWilliams. The fact that Mother had not been the primary caregiver to either child in over five years by the time of the termination hearing also concerned McWilliams and demonstrated to her Mother's pattern of relying on others.

McWilliams did not recommend reintegration because Mother failed to show an ability to parent the children long-term. McWilliams did not recommend reintegration even as to J.P.N. because of Mother's continued lack of availability. McWilliams opined that to recommend reintegration she would need to see for nine months to a year Mother consistently engage in individual therapy, take more initiative in the children's care, be more familiar with the children's providers, attend more appointments, and find more flexible employment that allowed Mother to be available for the children. Even so, McWilliams did not recommend giving Mother more time because the children had already spent much of their lives outside of Mother's primary care and they deserved stability and structure. McWilliams did not think that Mother could meet the children's needs of stability, structure, availability, boundaries, discipline, and nurturing. McWilliams opined that adoption was in the best interests of the children.

The hearing was continued until August 28, 2023. The State next called Grandmother. Grandmother had been the primary caretaker of J.P.N., who was five years old at the termination hearing, since she was born. Grandmother received custody of J.N.N. when she was 22 months old. Grandmother described how J.N.N.'s behaviors could be frightening, and they included things like banging her own head against the wall, and hitting, kicking, and trying to push J.P.N. out of the moving car on the highway.

After Grandmother became sick, she worried that she had to start neglecting the children because she was physically incapable of caring for them, so she called DCF for help. Grandmother described getting eight back surgeries and dealing with health conditions such as psoriatic arthritis and fibromyalgia that had become worse.

11

After moving to Wichita, Mother lived near Grandmother, which Grandmother thought was a good thing because "most of the time" Mother would get frustrated during her weekend visitation as the children did not listen to Mother and would boss her around. Mother reached out to Grandmother for assistance nearly every weekend.

Grandmother had concerns about Mother's ability to be the primary caretaker of the children. She shared her concerns with the case teams that Mother did not know how to raise a child and that she was only just beginning to learn her responsibilities as a parent. Grandmother worried about Mother's plan to move back with her and the children because Mother was the type of person who would back out of her responsibilities a little bit at a time until she was no longer responsible at all, and Grandmother's health was not suitable to shoulder the responsibility. Grandmother was concerned about her own ability to be the primary caretaker even as to J.P.N. where she could not take J.P.N. to activities like girl scouts and some days Grandmother found it hard to get off the couch.

Mother testified again, this time on her own behalf. Mother felt that J.N.N.'s behavior had improved over the last year or so, and she now only had small outbursts here or there. In the "most recent weeks" Mother had not had to call Grandmother for advice or assistance during weekend visitations, though Grandmother would call to say goodnight or check that the children were in bed. Since restarting therapy, Mother claimed to not being as frustrated, and she was learning how to be self-sufficient in her parenting. Mother was still trying to find a new job that allowed her to be home with the children more. She felt she could take care of J.P.N., but acknowledged Grandmother would have to assist part-time. Mother felt that sometime in the future she would be able to care for J.N.N. full-time. Mother loved the children and believed they loved her.

After the close of evidence the State argued that Mother had not been the primary caregiver for the children for most of J.N.N.'s life and all of J.P.N.'s life, and during most of that time the children had been involved with social services. The State focused on

12

Mother's failure to learn how to parent the children as the main reason why Mother was unfit to parent and that unfitness was unlikely to change. The guardian ad litem adopted the State's argument and added that this case had been pending since 2021, Mother had made progress only recently, and more time was required for Mother to show she was ready to parent the children, but the children deserved permanency before Mother would be able to demonstrate she was a fit parent. Mother argued that she need not guarantee success in parenting the children to retain her rights and that there was not enough evidence to terminate her parental rights especially as to J.P.N., but also J.N.N.

The district court continued the hearing until October 3, 2023, where it announced its ruling from the bench. The district court made many findings on Mother's testimony including that she admitted not being a consistent parent to the children, that she had not talked to J.N.N.'s placement about how they handle her outbursts, and that she was looking for a new job. The district court walked through Whaley's testimony and report, and it found the testimony to be credible. The district court similarly found McWilliams' testimony to be credible and Grandmother's testimony was deemed "very credible." The district court also walked through the psychological evaluation and the recommendation that Mother attend individual therapy. The district court ultimately found Mother unfit to parent under K.S.A. 38-2269(b)(7), (b)(8), (b)(9), and (c)(3). The district court found that Mother's unfitness was unlikely to change in the foreseeable future and that termination of Mother's parental rights was in the children's best interests. Mother timely appealed the district court's judgment, and the cases were consolidated for appeal.

ANALYSIS

On appeal, Mother claims the district court's findings of unfitness are not supported by clear and convincing evidence. She also claims the termination of her parental rights is not in the best interests of the children. In response, the State asserts that when viewed in the light most favorable to the prosecution, clear and convincing

13

evidence supports the district court's conclusion that Mother's parental rights should be terminated because she is presently unfit and will remain unfit in the foreseeable future. The State also asserts the district court did not abuse its discretion when it found that termination of Mother's parental rights was in the best interests of the children.

*Findings of unfitness*

K.S.A. 38-2269(a) governs termination of parental rights cases. The statute provides:

> "When the child has been adjudicated to be a child in need of care, the court may terminate parental rights or appoint a permanent custodian when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 38-2269(a).

K.S.A. 38-2269(b) and (c) lists the nonexclusive factors a court shall consider in making a determination of unfitness. Any one factor may, but does not necessarily, establish grounds for termination of parental rights. K.S.A. 38-2269(f).

On appellate review, the termination of parental rights will be upheld if, "after reviewing all the evidence in the light most favorable to the prevailing party, the district judge's fact-findings are deemed highly probable, i.e., supported by clear and convincing evidence. Appellate courts do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. [Citation omitted.]" *In re Adoption of Baby Girl G.*, 311 Kan. 798, 806, 466 P.3d 1207 (2020).

Upon making a finding of unfitness of the parent, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 38-2269(g)(1). In making such a decision, the court shall

give primary consideration to the physical, mental, and emotional health of the child. K.S.A. 38-2269(g)(1). Appellate courts review the district court's best interests of the child finding for an abuse of discretion. *In re R.S.*, 50 Kan. App. 2d 1105, 1116, 336 P.3d 903 (2014). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *In re A.S.*, 319 Kan. 396, 400, 555 P.3d 732 (2024). The party asserting the district court abused its discretion has the burden of showing it. 319 Kan. at 400.

*Unfitness under K.S.A. 38-2269(b)(7) and (b)(8)*

The district court found Mother unfit to parent the children under K.S.A. 38-2269(b)(7), (b)(8), (b)(9), and (c)(3). Mother claims none of the factors are supported by clear and convincing evidence. Subsection (b)(7) is the "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family" and (b)(8) is the "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child." K.S.A. 38-2269(b)(7), (8). Both factors implicate similar evidence in this case and provide a good starting point to this analysis.

This case centered on Mother's ability to parent the children full-time due to barriers such as Mother's mental health, her lack of parenting knowledge, her lack of effort to address those issues through therapy or support groups, failure to take initiative regarding the children, and her work schedule. The district court heard ample evidence that Mother struggled to parent the children.

Whaley testified that Mother's parent-child assessment showed Mother's parenting stress scores as high enough to need clinical intervention and she scored as high risk in her belief in corporal punishment and restricting the children's freedom. Whaley found some of Mother's actions concerning during the assessment, such as not preparing the children before leaving them in the room, not engaging with J.N.N., not responding to

J.N.N.'s affection, and missing opportunities to complement the children. Whaley recommended that Mother not be designated the primary caregiver until she learned and applied better parenting techniques and attended individual therapy.

Grandmother testified that she had concerns about Mother's ability to parent the children, and opined that even parenting a happy, healthy, and well-behaved child would be a test for Mother. She was also concerned about reintegration because Mother was the type of person to slowly back out of her share of the responsibility. Grandmother was concerned about her own ability to raise the children long-term due to her age and health. Mother relied on Grandmother's assistance during nearly every weekend visitation period. The district court found Grandmother's testimony to be "very credible."

McWilliams testified that the Geary County case team was vital to setting up Mother's evaluations and assessments and had tried to get her engaged in individual therapy. McWilliams addressed with Mother the need to attend therapy, but even so it took Mother a while to engage in the process. Mother found a new therapist in May 2023, just a few months before the termination hearing, and the therapist informed McWilliams she had not yet seen Mother enough to provide a report. Mother attended only four sessions by the termination hearing. Mother conceded that she found her new therapist through McWilliam's recommendation and that she needed to attend individual therapy.

Mother consistently told McWilliams that she needed help and support with the children. Her tune changed only after the district court found reintegration no longer viable. Mother failed to show McWilliams secondary changes, which she described as the ability to maintain and apply the techniques learned through completing the permanency plan and court orders. In that vein, Mother often enlisted Grandmother's aid during her weekend visitation, and "a lot of times" the children would end up at Grandmother's house during Mother's visitation because Mother had become overwhelmed. McWilliams attributed the successful visits to Grandmother's assistance.

McWilliams also addressed with Mother the need to attend J.N.N.'s appointments and learn more about her needs through, for example, speaking to J.N.N.'s placement about coordinating appointments and how they successfully handled J.N.N.'s outbursts. Mother showed little initiative to do so. McWilliams would need to see over nine months to a year Mother consistently engage in individual therapy, take more initiative in the children's care, be more familiar with the children's providers, attend more appointments, and find more flexible employment that allowed Mother to be available for the children.

Mother's work was also a barrier to reintegration. While Mother obtained a new job that allowed for more flexibility, she was still unable to attend J.N.N.'s appointments, plan how to care for the children full-time without Grandmother's consistent help, and commit more time to the children beyond her weekend visitation.

The evidence clearly and convincingly showed that Mother struggled throughout the pendency of this case to change her circumstances for the benefit of the children whether it be her availability in her work schedule or the secondary changes that McWilliams described as learning how to parent the children and apply the lessons that should have been learned while completing the case plan and court orders. Clear and convincing evidence showed that Mother was not much better prepared to raise the children full-time than she was at the beginning of the case. And those issues could have been addressed in, for example, individual therapy, which Mother neglected to attend for much of the case despite being pushed to do so by her case teams. The district court did not err in finding under K.S.A. 38-2269(b)(8) that Mother presented a lack of effort to adjust her circumstances, conduct, or conditions to meet the needs of the children.

The evidence also clearly and convincingly showed that reasonable efforts were made toward reunification, but those efforts failed. The same evidence described above showed that the case teams addressed the need for therapy with Mother and supplied her with resources to find a suitable therapist. This case has been pending since 2021,

17

showing Mother was given a reasonable time to improve her availability, learn to parent her children through the resources provided, and demonstrate those lessons learned. While Mother engaged in visitation and maintained a good relationship with the children, the evidence clearly and convincingly showed that Mother also dragged her feet to use the help her case teams offered to reintegrate with her children. The district court did not err in finding under K.S.A. 38-2269(b)(7) a failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family.

*Unfitness under K.S.A. 38-2269(b)(9) and (c)(3)*

K.S.A. 38-2269(b)(9) provides as an unfitness factor:

"whether, as a result of the actions or inactions attributable to the parent and one or more of the factors listed in subsection (c) apply, the child has been in the custody of the secretary and placed with neither parent for 15 of the most recent 22 months beginning 60 days after the date on which a child in the secretary's custody was removed from the child's home."

K.S.A. 38-2269(c)(3) pairs with subsection (b)(9) and lists as an unfitness factor the "failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home." Starting with subsection (c)(3), Mother claims that individual therapy was never a case plan task and therefore she cannot have failed to complete a reasonable plan for failing to attend individual therapy.

Mother's claim is not consistent with the record. Mother is correct to the point that there does not appear to be a case plan in the record that specifically and individually lists individual therapy as a court-ordered task. But Mother concedes that the case plans did include the specific task that Mother shall follow all recommendations resulting from the assigned evaluations, assessments, and tests. Mother received a court-ordered psychological evaluation in April 2021 that resulted in a recommendation that she attend

18

individual therapy until discharged. Mother's original case team and McWilliams tried to get Mother into therapy to little avail until May 2023, when the termination proceedings were scheduled. When Mother did attend therapy, McWilliams was unable to get a report from the therapist by the termination hearing because Mother had not been attending long enough. Mother conceded at the termination hearing that therapy was one of her "orders."

As to subsection (b)(9), Mother claims it does not apply because the children's placement with DCF was not the result of her actions or inactions. Rather, Mother claims the children were in DCF custody due to logistical challenges, the special needs of J.N.N., and inadequate communication from DCF and the case teams on the therapy issue. But Mother ignores that the evidence shows how her own inaction to finding suitable employment that promoted her availability was the primary contributor to the logistical troubles in this case. The evidence also showed that Mother put forth little effort to learn how to parent the children or handle J.N.N.'s special needs, again demonstrating Mother's inaction contributing to the children remaining out of her custody. The evidence showed individual therapy was recommended in written case plans and those plans were relayed to Mother by the case teams, again showing that Mother's inaction to attend individual therapy contributed to the children remaining in DCF custody. Mother does not dispute that the children were in DCF custody for the requisite time under subsection (b)(9). Thus, the evidence shows the district court did not err in finding Mother unfit to parent under K.S.A. 38-2269(b)(9) in conjunction with (c)(3).

*Whether Mother's unfitness was unlikely to change in the foreseeable future*

The district court found Mother's unfitness was unlikely to change in the foreseeable future by considering her past conduct as indicative of future behavior, Mother's lack of secondary changes, and that the children deserved a final resolution to this case within a time appropriate for a child's sense of time. In determining whether unfitness is unlikely to change in the foreseeable future, courts consider the issue in child

19

time because a child's perception of time differs from an adult's. *In re R.S.*, 50 Kan. App. 2d at 1117. Indeed, a year or two through a child's eyes will appear far longer as that time makes up a much greater portion of the child's short lifetime than an adult's. Courts may consider past conduct as an indicator of future behavior. *In re M.S.*, 56 Kan. App. 2d 1247, 1264, 447 P.3d 994 (2019).

The evidence addressed above need not be rehashed in great depth. That evidence in the light most favorable to the State clearly and convincingly shows Mother's past conduct of being unwilling or unable to learn to parent the children, make herself available to the children, or work on her own issues through mediums such as court ordered individual therapy. That past conduct over the more than two years this case was pending before the termination hearing is indicative that the trend will continue into the foreseeable future. McWilliams also testified that she needed to see nine months to a year of consistency from Mother before the recommended reintegration. That extra time, added to the more than two years this case had already been pending by the termination hearing, is substantial in child time. Grandmother also agreed that Mother was not yet ready to parent the children and expressed her concern that in the future Mother would slowly back out of her responsibilities and leave Grandmother with the burden again.

The evidence in the light most favorable to the State clearly and convincingly shows that Mother had a long history of inaction and that inaction was unlikely to change in the foreseeable future within an appropriate child time. The district court did not err in finding Mother's unfitness was unlikely to change in the foreseeable future.

*Best interests of the children*

The district court found termination to be in the children's best interests with consideration to their physical, mental, and emotional needs and the nature and strength of the parent-child relationship. Mother claims that because she was not abusive, had no

drug or alcohol issues, successfully completed weekend visits, and was bonded to the children, terminating her parental rights was not in the children's best interests. The State highlights much of the evidence already addressed above to argue otherwise.

These cases are difficult, and the evidence shows Mother and children have a meaningful bond. But just because Mother committed no insidious wrongdoing and just because the children and Mother love each other does not mean the district court abused its discretion in finding that termination of Mother's parental rights was in the children's best interests. The district court heard evidence that J.N.N. was succeeding with her placement and that Mother had not been J.P.N.'s primary caregiver in her entire life. McWilliams opined that future setbacks with Mother would be detrimental to the children. Under these circumstances, it is not unreasonable, arbitrary, or fanciful to find that the children's mental, emotional, and physical wellbeing would be best served by attaining finality and finding the consistency and structure in their upbringing that Mother had been unable to provide. Mother fails to show the district court abused its discretion in finding that termination of parental rights was in the best interests of the children.

Affirmed.